IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| MARGARET J. MILLER, | ) | 2 CA-CV 2004-0033 |
| | ) | DEPARTMENT B |
| Plaintiff/Appellant, | ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | |
| WILLIAM E. HEHLEN and ELSE | ) | |
| HEHLEN, husband and wife, | ) | |
| | ) | |
| Defendants/Appellees. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C 2002-4268

Honorable Deborah Bernini, Judge

AFFIRMED

Good & Associates, P.C.
  By Gregory E. Good and Janet L. Brauneis                                    Tucson

    and

The Goldstein Law Group, P.C.
  By Jeffrey M. Goldstein and Matthew J. Kreutzer                  Washington, D.C.
                                                    Attorneys for Plaintiff/Appellant

John A. Baade                                                                   Tucson
                                                  Attorney for Defendants/Appellees

P E L A N D E R, Chief Judge.

¶1        In this employment contract case, plaintiff/appellant Margaret Miller appeals from the trial court's grant of summary judgment in favor of Miller's former employee, defendant/appellee William Hehlen, and his wife on Miller's claims for breach of contract and of the implied covenant of good faith and fair dealing, misappropriation of trade secrets, conversion, tortious interference with business expectancy, and defamation.[1] The trial court also awarded attorney fees to Hehlen pursuant to A.R.S. § 12-341.01(A). We have jurisdiction pursuant to A.R.S. § 12-2101(B) and, for the reasons set forth below, we affirm the trial court's judgment.

**BACKGROUND**

¶2        Although the pertinent facts in this case are essentially undisputed, on appeal from a summary judgment, we view the evidence of record and reasonable inferences therefrom in the light most favorable to the party against whom judgment was entered. *Bothell v. Two Point Acres, Inc.*, 192 Ariz. 313, ¶ 2, 965 P.2d 47, 49 (App. 1998). Miller works as a tax-preparer and operates several offices. For approximately fifteen years, up to 2001, Miller operated her business as an H&R Block ("Block") franchise under a franchise agreement she and Block had executed. Miller employed Hehlen in that business as an income tax return preparer for five tax seasons, 1997 through 2001. At the beginning of each

---

[1]Although Hehlen counterclaimed for breach of contract and violation of A.R.S. § 23-352, he later voluntarily withdrew those claims.

2

tax season, including 2001, Hehlen and Miller executed a form employment agreement that Block not only supplied but also required under its franchise agreement with Miller. Block terminated Miller's franchise in April 2001, which Miller is currently challenging in a separate, federal court action, and thereafter Miller operated her business under the name, "MJM & Associates."

¶3 In the course of her business, Miller maintained a database of customer information, including customer data sheets. Until 2001, when Miller asked him to stop, Hehlen kept a customer list he had created from those data sheets on a spreadsheet on his home computer. After Miller instructed Hehlen not to take the customer data sheets home, he surreptitiously began writing customer names on copies of receipts that he had been permitted to keep to track revenue generation. He then added the names to his computer spreadsheet at home. After Hehlen's employment with Miller had ended, in June 2001 Miller provided him with substantially the same customer list in connection with a pay dispute between them.

¶4 In December 2001, Miller sent her existing clients a postcard that referred to "Bill" as one of her associates, even though Hehlen no longer worked for her at that time. In 2002, Hehlen went to work at another Block office operated directly by Block in Oro Valley. At or near the beginning of the tax season that year, purportedly in response to the postcard Miller had sent out, Hehlen began contacting the customers whose names he had obtained from Miller's office, using a calling script and recording the results of the calls on

his spreadsheet. When Miller became aware of those calls in February 2002, she sent Hehlen a cease and desist letter and subsequently filed this action.

## DISCUSSION

### Standard of Review

¶5        On appeal from a summary judgment, we determine de novo whether any genuine issues of material fact exist and, if not, whether the trial court erred in applying the law. *Bothell*, 192 Ariz. 313, ¶ 8, 965 P.2d at 50. We also review de novo issues of statutory and contract interpretation. *See Andrews v. Blake*, 205 Ariz. 236, ¶ 12, 69 P.3d 7, 11 (2003); *Turf Paradise, Inc. v. Maricopa County*, 179 Ariz. 337, 340, 878 P.2d 1375, 1378 (App. 1994).

### Contract Claim

¶6        Miller contends the trial court erred in ruling that she could not enforce against Hehlen the employment agreement he signed in 2001. She also argues Hehlen clearly breached that agreement by violating its express terms. The employment agreement was between "William Hehlen . . . ('Associate')" and "Margaret Miller, doing business as H&R Block ('the Company')." It included a provision that defined "confidential business information" and generally prohibited Hehlen from reproducing, removing, divulging, misappropriating, or misusing such information. The employment agreement also contained noncompetition and nonsolicitation covenants that applied during the term of the agreement and for two years after its termination.

4

**¶7** In addition, the employment agreement provided that the foregoing covenants and agreements "shall survive the termination of this Agreement." It further stated: "This Agreement shall inure to the benefit of the successors and assigns of the Company." Finally, the employment agreement provided, "[i]t is intended that [Block] and its affiliates be third party beneficiaries to this Agreement."

**¶8** Although it is unclear whether Hehlen's calls to former clients in 2002 constituted solicitation, Hehlen acknowledged during his deposition that he had made copies of "confidential information" and had prepared a return for one of Miller's former clients. If Miller could legally enforce the employment agreement against Hehlen, his actions arguably would constitute a breach and preclude summary judgment on Miller's contract claim.

**¶9** The trial court, however, implicitly ruled that Miller could not enforce the employment agreement and, therefore, did not reach the question of breach. Hehlen argues that ruling was correct because, once Block terminated Miller's franchise in April 2001, she was "no longer 'doing business as H&R Block'" and thereafter "lost the right to enforce the non-competition provisions contained in Hehlen's employment agreement." In contrast, Miller urges us to reject that argument because neither her franchise agreement with Block nor the employment agreement with Hehlen expressly conditioned her right to enforce the noncompetition provision and other covenants against him on her continuing status as a Block franchisee.

5

**¶10** As the trial court apparently determined, Miller's breach of contract claim turns on the meaning of "Margaret Miller, doing business as H&R Block" in the employment agreement. Miller asserts that her "'doing business as' trade designation did not transform Miller into Block." Even if the trial court expressly had disagreed with that assertion,[2] we agree with Miller on this point; but it does not resolve the question of whether she could enforce the employment agreement after her Block franchise was terminated.

**¶11** Both parties acknowledge that we must interpret a contract in a way that gives meaning to all its material terms and renders none superfluous. *Gfeller v. Scottsdale Vista North Townhomes Ass'n*, 193 Ariz. 52, ¶ 13, 969 P.2d 658, 660 (App. 1998). We cannot simply ignore the phrase "doing business as H&R Block." Although we do not interpret that phrase to mean that Miller and Block are synonymous, the phrase "Margaret Miller, doing business as H&R Block" must have a distinct meaning from "Margaret Miller," a name that does not appear alone in either the employment or the franchise agreement. With these principles in mind, we focus on whether Miller was required to be "doing business as H&R Block" in order to enforce the employment agreement.

---

[2]According to Miller, the trial court incorrectly interpreted the phrase "the Company" in the employment agreement to mean Block. But the record does not clearly reflect that the trial court equated "the Company" with Block. Rather, at the end of the oral argument on Hehlen's motion, the court simply "f[ound] on the faces of the documents that were incorporated as part of the pleading papers that [Miller's] position is incorrect." The trial court's minute entry and formal judgment shed no more light on its ruling. In any event, "[w]e will affirm [a summary judgment] if the trial court's ruling is correct on any ground." *Rowland v. Great States Ins. Co.*, 199 Ariz. 577, ¶ 6, 20 P.3d 1158, 1162 (App. 2001); *see also City of Tempe v. Outdoor Systems, Inc.*, 201 Ariz. 106, ¶ 14, 32 P.3d 31, 36 (App. 2001).

**¶12** It is well established that contract "words . . . are interpreted in the light of all the circumstances." Restatement (Second) Contracts § 202(1) (1981). "When interpreting an agreement, the court may always consider the surrounding circumstances" and "the context in which it was made." *Smith v. Melson, Inc.*, 135 Ariz. 119, 122, 659 P.2d 1264, 1267 (1983); *see also Burkons v. Ticor Title Ins. Co.*, 168 Ariz. 345, 350-51, 813 P.2d 710, 715-16 (1991) (same); *Potter v. U.S. Specialty Ins. Co.*, 209 Ariz. 122, ¶ 7, 98 P.3d 557, 559 (App. 2004) ("[W]e consider the language of the contract in view of the surrounding circumstances."). In addition, "courts are not constrained by textual omissions to abandon common sense and experience or to ignore the surrounding circumstances of an agreement." *Southwest Sav. & Loan Ass'n v. SunAmp Sys., Inc.*, 172 Ariz. 553, 560, 838 P.2d 1314, 1321 (App. 1992). Similarly, "[i]t is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in a context." Restatement (Second) Contracts § 212, cmt. b (1981).

**¶13** Applying these principles, we consider the pertinent circumstances in determining the meaning or effect of the phrase, "Margaret Miller, doing business as H&R Block" in the employment agreement.[3] As the trial court noted and as Hehlen argues, one

---

[3]The trial court expressly ruled, and both parties argue, that the employment agreement is unambiguous. But even if the agreement were "'reasonably susceptible'" to differing interpretations, that would merely permit the parties to introduce relevant, extrinsic evidence "to determine the meaning intended by the parties," rather than "to contradict or vary the meaning of the agreement." *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993). Miller, however, proffered no extrinsic evidence below of the parties' contractual intent, has consistently maintained that the employment agreement is unambiguous, and now concedes that the franchise agreement is relevant to

7

of those circumstances is the franchise agreement between Block and Miller.[4] And that is so even though Hehlen was not a party to that agreement and is not involved in the ongoing federal court litigation relating thereto. As he points out, the franchise agreement and employment agreement are interrelated, in that "[e]ach contemplates the existence of the other." Block drafted both form contracts and required franchisees such as Miller to not only execute a franchise agreement but also to have any franchise employees such as Hehlen execute Block's employment agreement, including its noncompetition provisions, "in the form prescribed by Block."

¶14        In addition, the franchise agreement provides that Block ultimately controls the confidential information in question. And, upon termination of her franchise, Miller was contractually obligated to return to Block, inter alia, "customer lists, [and] customer names." Miller emphasizes that she and Block are embroiled in ongoing, federal court litigation over the termination of her franchise and Block's claim for Miller's customer files and related materials. But, the ultimate outcome of that case is immaterial; Miller was no longer "doing

interpreting the employment agreement. *See* n.4, *infra.* Therefore, any analysis of the latter agreement under *Taylor*, never having been urged by Miller, is not warranted now. Moreover, although the primary objective in contract law is to discern and effect the contracting parties' intent, *Taylor*, 175 Ariz. at 153, 854 P.2d at 1139, any such inquiry is difficult when, as here, the parties engaged in no significant negotiations, but rather merely executed form agreements prepared and required by a third party. *Cf. Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 393, 682 P.2d 388, 398 (1984) (recognizing that "most provisions of standardized agreements are not the result of negotiation; often, neither customer nor salesperson are aware of the contract provisions").

    [4]Although Miller contended in her briefs that examination of the franchise agreement is neither "necessary nor proper" because that agreement is irrelevant to her contract claim against Hehlen, Miller abandoned that position at oral argument in this court.

8

business as H&R Block" when she sought to enforce the employment agreement against Hehlen. Based on the franchise agreement and employment agreement, Miller's right to enforce the latter hinged on her continuing to do business "as H&R Block."

¶15 Miller also asserts that the phrase "doing business as H&R Block" in the employment agreement is "merely descriptive of her business, and has no legal effect."[5] Therefore, she argues, the "phrasing . . . does not legally or factually support a conclusion that Miller is H&R Block." But, as we noted in n.2, *supra*, it is not clear that the trial court reached that conclusion and, to the extent it might have, any such conclusion is incorrect but irrelevant to the propriety of the ultimate ruling. In addition, that "Margaret Miller" and "Margaret Miller, doing business as H&R Block" arguably were one and the same for other legal purposes does not necessarily mean she was legally entitled to enforce the employment agreement after her Block franchise was terminated in April 2001. Even if Miller was legally equivalent to her sole proprietorship after that time, she clearly was not "Margaret Miller, doing business as H&R Block" from that time forward.

¶16 Miller further argues, however, that the reference to "doing business as H&R Block" was simply a "trade designation" that did not require her to continue doing business as H&R Block in order to enforce the employment agreement. In support of that argument,

---

[5]Hehlen maintains that Miller did not raise this argument below and, therefore, we should not consider it on appeal. Although it appears Miller did not urge this particular point in the trial court, in our discretion we may consider arguments not raised below. *See City of Tempe v. Fleming*, 168 Ariz. 454, 456, 815 P.2d 1, 3 (App. 1991) (waiver rule is procedural, not jurisdictional, and may be suspended in court's discretion). We do so here, but reject the argument on its merits.

9

Miller cites a criminal racketeering case for the proposition that a "doing business as" designation "'does not create an entity distinct from the person operating the business.'" *State v. Ivanhoe*, 165 Ariz. 272, 274, 798 P.2d 410, 412 (App. 1990), *quoting Duval v. Midwest Auto City*, 425 F. Supp. 1381, 1387 (D. Neb. 1977), *aff'd*, 578 F.2d 721 (8th Cir. 1978). But the issue addressed in *Ivanhoe*—whether a sole proprietorship was an enterprise within the meaning of Arizona's racketeering statute—was very different from the contract interpretation question posed here. *Id.*

¶17        The court in *Ivanhoe* stated that a sole proprietorship "has no existence apart from the individual." *Id*. at 274, 798 P.2d at 412; *see also Duval*, 425 F. Supp. at 1387 ("Doing business under another name does not create an entity distinct from the person operating the business."). And, as Miller correctly points out, other courts have similarly concluded that a sole proprietorship using a fictitious name does not have a separate legal existence from the individual business owner. *See, e.g.*, *Southern Ins. Co. v. Consumer Ins. Agency, Inc.*, 442 F. Supp. 30 (E.D. La. 1977); *Pinkerton's, Inc. v. Superior Court*, 57 Cal. Rptr. 2d 356, 361 (Cal. App. 1996); *Providence Washington Ins. Co. v. Valley Forge Ins. Co.*, 50 Cal. Rptr. 2d 192, 194 (Cal. App. 1996); *Hall v. Auto-Owners Ins. Co.*, 658 N.W.2d 711, 716 (Neb. 2003).

¶18        That sound legal principle protects parties who interact with a sole proprietorship by ensuring that the individual business owner does not obtain a de facto form of limited liability or a benefit to which he or she would not otherwise be entitled. It does not necessarily follow, however, that an individual's contractual rights will be coterminous

10

with those of his or her business, even a sole proprietorship. Some courts have recognized that distinction by construing the "doing business as" designation as a limiting term in the context of insurance contracts, restricting a contracting party's rights to enforcement to those of only the named business. In *Consolidated American Insurance Co. v. Landry*, 525 So. 2d 567 (La. App. 1988), for example, the court held that a commercial general liability policy insuring "Landry d/b/a Landry's Apartments" did not provide coverage for "Landry d/b/a Landry's Lumber Yard." *Id*. at 568. The court recognized that Landry might have incurred liability through the operation of the lumber yard, but the apartment business, which carried the insurance, was "a separate and distinct business pursuit, even [though] he operate[d] both as a sole proprietor." *Id*. at 568; *see also Charter Oak Fire Ins. Co. v. Coleman*, 273 F. Supp. 2d 903 (W.D. Ky. 2003). *But see Carlson v. Doekson Gross, Inc.*, 372 N.W.2d 902, 906 (N.D. 1985) (holding that individual is the named insured, regardless of language following a "dba").

¶19　　　　The *Landry* case dealt with an owner of multiple sole proprietorships in the insurance context, a setting and factual scenario different from the employment agreement at issue here. Nonetheless, in construing the meaning and effect of that agreement in this case, we find the reasoning of *Landry* persuasive and applicable. Just as Landry's two businesses were "separate and distinct" even though he operated both, so, too, was Miller distinct from her Block franchise operation.

¶20　　　　If Miller had wanted the noncompetition provision and other covenants in the employment agreement to apply to her personally and not merely to her "doing business as

11

H&R Block," she could and should have required Hehlen to execute an addendum or amendment to that effect. Although a sole proprietorship may not exist separately from its owner, it seems clear to us that an individual does have a separate legal existence from his or her business. Considering the surrounding circumstances reflected in this record, the "doing business as H&R Block" language in the employment agreement should be interpreted to reflect that fact. In addition, if "Margaret Miller" were able to enforce the employment agreement even after her Block franchise was terminated, the phrase "doing business as H&R Block" would lose any meaning and be rendered superfluous, a result Arizona law does not countenance. *See Gfeller*, 193 Ariz. 52, ¶ 13, 969 P.2d at 660.

¶21        At oral argument in this court, Miller focused primarily on the statement in the employment agreement that "[t]his Agreement shall inure to the benefit of the successors and assigns of the Company."[6] Relying on that provision, Miller contended for the first time at oral argument that her current sole proprietorship, "MJM & Associates," is a "successor[]" or "assign[] of the Company" and, as such, may enforce the employment agreement against Hehlen even after Block terminated her franchise. "Generally, issues and arguments raised for the first time at oral argument on appeal are untimely and deemed waived." *Mitchell v. Gamble*, 207 Ariz. 364, ¶ 16, 86 P.3d 944, 949-50 (App. 2004); *see also Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 503, 733 P.2d 1073, 1086 (1987) ("Efficient and orderly administration requires some point in time at which it is too late to raise new issues on

—————————————

[6]As noted in ¶ 6 above, and as both parties agree, the phrase "the Company" in the employment agreement refers to "Margaret Miller, doing business as H&R Block."

12

appeal."); *but see Liristis v. Am. Family Mut. Ins. Co.*, 204 Ariz. 140, ¶ 10, 61 P.3d 22, 25 (App. 2002) (on appeal from summary judgment, "court has discretion to read and interpret [contract] correctly and is not necessarily limited to the arguments made by the parties"). Miller waived this new argument by failing to raise it below or in her briefs. But even had she preserved the argument, we find it without merit.

¶22    In *Supplies for Industry, Inc.* (SFI) *v. Christensen*, 135 Ariz. 107, 659 P.2d 660 (App. 1983), a case neither party cites, this court analyzed an employment agreement that, similar to the agreement here, provided it "'shall inure to the benefit of and be binding upon the Company [IMC], its successors and assigns.'" *Id*. at 109, 659 P.2d at 662. Based on other language in the employment agreement between IMC and Christensen, principles of equitable assignment, and the third party beneficiary status of the plaintiff, SFI, this court concluded that SFI could enforce a covenant not to compete in that agreement, despite prior sales of SFI stock to other companies. We need not dissect the somewhat complicated facts or reasoning of that case. But we note that, unlike *Christensen*, the record here does not reflect, nor did Miller argue, that any assignment, equitable or otherwise, occurred between "Margaret Miller, doing business as H&R Block," and "MJM & Associates."

¶23    Moreover, even had any such assignment occurred, "'"[t]he assignee's right . . . is subject to limitations imposed by the terms of that contract and to defenses which would have been available against the obligee had there been no assignment."'" *Indep. Nat'l Bank v. Westmoor Elec., Inc.*, 164 Ariz. 567, 571, 795 P.2d 210, 214 (App. 1990), *quoting Bus. Fin. Servs. v. Butler & Booth Dev. Co.*, 147 Ariz. 510, 512, 711 P.2d 649, 651 (App.

13

1985), *quoting* Restatement (Second) of Contracts § 336, cmt. b (1981); *see also* Restatement (Second) of Contracts § 336 (1) (1981) ("[I]f the right of the assignor would be . . . unenforceable against [the obligor] if no assignment had been made, the right of the assignee is subject to the infirmity."). In addition, the Miller-Block franchise agreement generally requires Block's prior written approval of any direct or indirect transfer, including assignment, by the franchisee of any interest in the franchise. Thus, neither the record nor the law permits Miller or MJM & Associates, as an alleged assignee of her former Block franchise, to now enforce the employment agreement against Hehlen.

¶24       Nor does Miller's renamed sole proprietorship, MJM & Associates, qualify as a "successor" to "the Company" (Margaret Miller, doing business as H&R Block). "The word 'successor' has been defined as 'one who takes the place that another has left, and sustains the like part or character.'" *Lake Havasu Resort, Inc. v. Commercial Loan Ins. Corp.*, 139 Ariz. 369, 374, 678 P.2d 950, 955 (App. 1983), *quoting H.K.H. Co. v. Am. Mortgage Ins. Co.*, 685 F.2d 315 (9th Cir. 1982).[7] As Hehlen correctly points out, "Miller

---

[7]*See Black's Law Dictionary* 1473 (8th ed. 2004) (defining "successor in interest" as "[o]ne who follows another in ownership or control of property. A successor in interest retains the same rights as the original owner, with no change in substance."); *see also A.R. Teeters & Assocs., Inc. v. Eastman Kodak Co.*, 172 Ariz. 324, 330-31, 836 P.2d 1034, 1040-41 (App. 1992) (stating that "substantial similarity of ownership and control" between entities was insufficient to impose successor liability); *Citizens Suburban Co. v. Rosemont Dev. Co.*, 53 Cal. Rptr. 551, 557 (App. 1966) (defining successor as "one who takes the place of another and sustains his part or character"); *City of New York v. Turnpike Dev. Corp.*, 233 N.Y.S.2d 887, 890 (N.Y. Sup. Ct. 1962) ("In order to be a 'successor in interest', a party must continue to retain the same rights as the original owners without a change in ownership. There must be a change in form only and not in substance."); *Augusta Court Co-Owners' Ass'n v. Levin, Roth & Kasner*, 971 S.W.2d 119, 126 (Tex. App. 1998) ("[A] 'successor' is

14

is not a successor to 'the Company' . . . because she did not acquire the Company's defining asset, *viz.* the H&R Block franchise."

¶25 This case also differs from *Christensen* in another important respect. There, the court noted: "The obvious purpose of the covenant not to compete was to protect the business operated by SFI even if SFI should change its name. The intent was to benefit SFI." *Christensen*, 135 Ariz. at 109, 659 P.2d at 662. That cannot be said about Miller in this case. The employment agreement and franchise agreement, read in tandem, do not reveal an "obvious purpose" to protect Miller and her accounting business even after she lost her franchise and had no other relationship with Block. Again, there is no clear intent in the two agreements to benefit Miller in any capacity other than as a Block franchisee. Accordingly, Miller's new arguments based on theories of assignment or successorship, even if not waived, are without merit.

¶26 In sum, based on the terms of Miller's franchise agreement with Block and a plain reading of the interrelated employment agreement, we affirm the trial court's summary judgment ruling on Miller's contract claims. We do so, however, only on the ground that Miller cannot enforce the latter agreement against Hehlen because she is no longer "doing business as H&R Block."

one who not only takes another's place, but also maintains the character of the place taken. It contemplates an assumption of both rights and obligations or 'stepping into the shoes' of another.").

15

**Trade secrets**

¶27 Miller further contends "Hehlen's actions violated Arizona's Uniform Trade Secrets Act" ("the Act"), A.R.S. §§ 44-401 through 44-407, because he misappropriated her trade secrets through improper means. The Act defines a "'[t]rade secret'" as

> information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S. § 44-401(4). Additionally, in pertinent part, "'[m]isappropriation'" under the Act means either:

> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.
>
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who . . .
>
> (i) Used improper means to acquire knowledge of the trade secret.

§ 44-401(2). Finally, under the Act "'[i]mproper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." § 44-401(1).

16

¶28 Although Hehlen compiled a customer list of his own while employed by Miller, his uncontested deposition testimony established that Miller had voluntarily given him a list of customers in June 2001 that contained substantially the same information.[8] It is noteworthy that Hehlen was no longer working for Miller at that time and that Miller did not expressly condition or limit Hehlen's use of the information on that customer list. In addition, Hehlen's uncontroverted affidavit below established that when he had contacted customers in 2002, he had only contacted people on the list Miller had given him in June 2001.[9]

¶29 To warrant either injunctive relief or damages under the Act, Hehlen must have "misappropriat[ed]" a trade secret. A.R.S. §§ 44-402(A) ("Actual or threatened misappropriation may be enjoined."); 44-403(A) (damages recoverable "for misappropriation"). As noted above, the alleged misappropriation here requires use of

---

[8]When asked at her deposition whether she had given Hehlen the list, Miller testified, "I don't remember at all." Contrary to Miller's oral argument in this court, her deposition testimony, construed in the light most favorable to her, does not reflect any denial of the fact that she had voluntarily given the customer list to Hehlen in June 2001. Rather, in follow-up, direct examination by her own counsel, Miller confirmed in the deposition that she simply "didn't recall whether [she] did" give the list to Hehlen at that time.

[9]At oral argument in this court, Miller asserted that Hehlen's affidavit itself reflected that he actually had used other information, improperly acquired by him from Miller, when he contacted prospective clients in 2002. We disagree. In his affidavit, Hehlen stated, "[t]he names of these people were on the print out that Miller gave me as well as my own records." Contrary to Miller's argument, that statement clearly reflects that the people Hehlen called in 2002 were on both lists, his own and that given to him by Miller in June 2001. Moreover, because the record does not contain the latter list, even though it was a deposition exhibit below, we cannot confirm Miller's assertion that only the list Hehlen improperly obtained from her included telephone numbers.

17

"improper means." § 44-401(2)(a) and (2)(b)(i). Because Miller cannot enforce the employment agreement with Hehlen, that agreement cannot serve as the basis for a "duty to maintain secrecy." § 44-401(1). Likewise, inasmuch as Miller no longer employed Hehlen at the time she disclosed the list to him, he owed her no duty at that time as an employee. In short, Hehlen did not use improper means to acquire the information he used to contact customers in 2002, even assuming that information constitutes a "trade secret."

¶30　　　　Moreover, the information at issue here does not constitute a "trade secret" within the meaning of the Act. A trade secret, inter alia, must "derive[] independent economic value . . . from . . . not being readily ascertainable by proper means by . . . other persons who can obtain economic value from its disclosure or use." § 44-401(4)(a). It must also be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Enter. Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, ¶ 23, 3 P.3d 1064, 1070 (App. 1999). Miller correctly argues that a party's reasonable efforts to maintain secrecy "need not be absolute." *Id*. In addition, "the owner of a trade secret does not relinquish its secret by disclosure to employees on a necessary basis or by limited publication for a restricted purpose." *Id*. But when Miller gave the list to Hehlen in June 2001, she did not disclose the list to an employee because, again, she no longer employed Hehlen at that time. Accordingly, we affirm the trial court's judgment in favor of Hehlen on the trade-secrets claim.

18

**Interference with business relations**

¶31 Relying solely on the Act, Miller also contends "Hehlen used improper means to interfere with Miller's contractual relations with her customers." But just as Miller could not establish for purposes of the Act that Hehlen used improper means to obtain the list he ultimately used to contact customers, she likewise cannot establish the required element of impropriety under our common law.

¶32 To establish a prima facie claim for tortious interference with contract, a plaintiff must show "the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted." *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427, 909 P.2d 486, 494 (App. 1995). The interference must be "improper" before liability will attach. *Bar J Bar Cattle Co. v. Pace*, 158 Ariz. 481, 483, 763 P.2d 545, 547 (App. 1988). And, "a competitor does not act improperly if his purpose at least in part is to advance his own economic interests." *Id*. at 485, 763 P.2d at 549; *see also* Restatement (Second) of Torts § 768 (1979). "The need for caution [in finding liability] is doubly required where the effect of the actor's interference is only to cause the cancellation of a terminable contract." *Bar J Bar Cattle Co.*, 158 Ariz. at 483, 763 P.2d at 547.

¶33 At most, the record merely reflects a business expectation Miller might have had that customers would return from year to year, rather than any formal contract with them.

19

Thus, the "need for caution" referred to above applies with even greater force here. *Id.* Because there is nothing in the record showing that Hehlen acted improperly in calling the customers on the list he had received from Miller—the only conduct potentially supporting her claim for interference with business relations—that claim fails. Therefore, the trial court did not err in granting summary judgment in favor of Hehlen on that claim.

**Conversion**

¶34 Miller further argues that the material facts support a claim that "Hehlen converted her customer list by taking her customer information and interfering with the relationships Miller established with those customers." Arizona has adopted the following definition of conversion, which is in the Restatement (Second) of Torts § 222A(1) (1965): "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *See Focal Point, Inc. v. U-Haul Co. of Ariz.*, 155 Ariz. 318, 319, 746 P.2d 488, 489 (App. 1986). If those elements are shown, a court must then consider the seriousness of the interference and whether the offending party must pay full value. *See* Restatement (Second) of Torts § 222A(2).

¶35 Even if the customer list constituted a "chattel," the record does not support a finding that Hehlen's actions rose to the level of a conversion. "An action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document." 18 Am. Jur. 2d, Conversion § 7 (2004); *see also* Restatement § 242 cmt. a. Miller did not allege that Hehlen took a customer list in the

20

form of a single, unified document that had value as tangible property. Nor does a customer list constitute intangible property merged with a document in the same sense as a stock certificate or an insurance policy. Thus, neither rationale supports a claim of conversion based on taking a customer list. *See Ill. Minerals Co. v. McCarty*, 48 N.E.2d 424, 430 (Ill. App. Ct. 1943) (conversion claim "could not lie for . . . copied list of names and information; . . . conversion and trover only lie for specific tangible personal chattels or . . . tangible evidence of title to intangible or real property").

¶36        Further, the record does not establish that Hehlen exercised intentional dominion or control over the customer list in such a way that he interfered with Miller's rights to the extent that he should be required to pay the full value of the list, whatever that might be. That is particularly so in light of the terms of Miller's franchise agreement with Block.

¶37        Conversion also requires conduct intended to affect property of another. The intent required is "'an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights.'" *Sterling Boat Co. v. Ariz. Marine, Inc.*, 134 Ariz. 55, 58, 653 P.2d 703, 706 (App. 1982), *quoting* William Prosser, *Handbook on the Law of Torts* § 15, at 83 (4th ed. 1971). In his affidavit below, Hehlen averred that "the names of the[] people [contacted] were on the print out that Miller gave me as well as my own records." Miller produced no evidence to contradict that statement or to show that Hehlen had intended to do, or in fact did, anything with the list he had created that was inconsistent

21

with her rights. Therefore, the trial court properly entered summary judgment in favor of Hehlen on Miller's conversion claim.

**Defamation**

¶38 Miller also challenges the trial court's grant of summary judgment on her defamation claim. Miller alleged below that Hehlen had defamed her by telling clients she was no longer in business. Under Rule 56(c)(1), Ariz. R. Civ. P., 16 A.R.S., Pt. 2, the trial court must consider "pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any." But, the only "evidence" Miller introduced on this point was her disclosure statement submitted pursuant to Rule 26.1, Ariz. R. Civ. P., 16 A.R.S., Pt. 1. Miller cites no law, and we are not aware of any, supporting the conclusion that descriptions of witness testimony in a Rule 26.1 disclosure statement constitute sufficient evidence to defeat a motion for summary judgment accompanied by the sworn affidavit of the movant. In light of Hehlen's uncontroverted testimony that he "did not tell . . . any one . . . that Ms. Miller was not in the tax business," the trial court did not err in entering judgment in Hehlen's favor on Miller's defamation claim.[10]

## DISPOSITION

¶39 The trial court's judgment in favor of Hehlen is affirmed. In our discretion, we deny Hehlen's request, made pursuant to A.R.S. § 12-341.01(A), for an award of attorney

---

[10]At oral argument in this court, in support of her defamation claim, Miller cited a page from Hehlen's deposition in which he allegedly testified that he had told others that Miller was no longer operating as "MJM & Associates." The record, however, does not include that page.

22

fees on appeal. *See Hale v. Amphitheater Sch. Dist. No. 10*, 192 Ariz. 111, 117, 961 P.2d 1059, 1065 (App. 1998) (court has discretion on whether to award attorney fees on appeal).

_____
JOHN PELANDER, Chief Judge

CONCURRING:


_____
M. JAN FLÓREZ, Presiding Judge


_____
PHILIP G. ESPINOSA, Judge