NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

DENNIS HANKERSON, individually and as Trustee of the D.P. Equipment Marketing Inc. Profit Sharing Plan, *Plaintiff/Appellant*,

*v.*

WILLIAM (BILL) HANKERSON and RITA HANKERSON, husband and wife; and HANKERSON MANAGEMENT COMPANY, LLC, an Arizona limited liability company, *Defendants/Appellees*.

No. 1 CA-CV 15-0109
FILED 5-10-2016

Appeal from the Superior Court in Maricopa County
No. CV2013-001790
The Honorable Mark H. Brain, Judge

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

COUNSEL

Broening Oberg Woods & Wilson, PC, Phoenix
By Richard E. Chambliss, Kevin R. Myer
*Counsel for Plaintiff/Appellant*

Mitchell & Associates, Phoenix
By Robert D. Mitchell, Megan R. Jury, Sarah K. Deutsch
*Counsel for Defendants/Appellees*

---

## MEMORANDUM DECISION

Presiding Judge Kent E. Cattani delivered the decision of the Court, in which Judge Samuel A. Thumma and Judge Randall M. Howe joined.

---

**C A T T A N I**, Judge:

**¶1**        Dennis Hankerson ("Dennis"), acting individually and as trustee of the D.P. Equipment Marketing Inc. Profit Sharing Plan, appeals from the superior court's entry of summary judgment in favor of his brother William Hankerson ("Bill"), Bill's wife Rita Hankerson, and the Hankerson Management Company, LLC ("HMC"), in a case involving the brothers' respective roles and interests in two oil-and-gas investment ventures: Jackpot Oil ("Jackpot") and Two Deuces Oil & Gas ("Two Deuces").[1]  For reasons that follow, we affirm summary judgment regarding Bill's use of a promissory note as his capital contribution to Two Deuces, reverse summary judgment regarding HMC's allocation of alleged sales expenses, vacate the award of expert accounting fees, and remand for further proceedings.

### FACTS AND PROCEDURAL BACKGROUND

**¶2**        In mid-1989 Bill formed and became the managing general partner of Jackpot, a limited partnership.  Dennis, along with other investors, joined Jackpot as a limited partner.  Dennis made initial capital contributions (part cash, part in the form of promissory notes) under the terms of subscription agreements, through which he also agreed to the terms of the limited partnership agreement.  The terms of the agreement required Bill to make a capital contribution as managing general partner, although the form of the contribution was not specified.

**¶3**        In early 1991, Bill formed and became the managing general partner of Two Deuces, similarly a limited partnership.  As with Jackpot, Dennis and other investors joined as limited partners. Dennis made initial capital contributions (a portion in cash and the balance through promissory notes), and he agreed to the terms of Two Deuces' limited partnership

---

[1]        We refer to Dennis Hankerson and Bill Hankerson by their first names to avoid confusion.  References to Dennis are to him acting individually and on behalf of his profit-sharing plan.

agreement. Bill executed an interest-bearing promissory note for $18,787.88 (the "Promissory Note") as a capital contribution to establish his managing general partner's interest in the partnership.

¶4        In early 1995, Bill converted the Jackpot and Two Deuces partnerships into limited liability companies. At the same time, HMC was substituted for Bill as manager of Jackpot LLC and Two Deuces LLC, and HMC acquired and assumed all of the rights and obligations Bill formerly held as managing general partner of the limited partnerships. Dennis agreed to the conversion and signed the companies' operating agreements, thus becoming a member of the two new LLCs.

¶5        In November 2007, HMC paid Two Deuces $72,763.42 on the Promissory Note, an amount based on HMC's calculation of principal plus over $50,000 in accrued interest.

¶6        In mid-2008, HMC sold Jackpot's and Two Deuces' oil and gas reserves, and Dennis and the other investors sold their membership interests in the two LLCs, receiving a substantial return on their initial investments. In the course of reconciling the sales of the ventures, HMC prepared documents captioned "Reconciliation of Sale and Final Distributions" for both Jackpot and Two Deuces. Both documents detailed "Costs Incurred after effective date but allocable to cost of Sale," with the amounts totaling $34,622.17 for Jackpot and $68,881.93 for Two Deuces (the "Disputed Costs").

¶7        In 2013, Dennis filed the instant lawsuit, asserting claims for breach of fiduciary duty, constructive fraud, breach of contract, breach of the covenant of good faith and fair dealing, and negligence. The claims stemmed from (1) allegedly improper distributions from Two Deuces to Bill and HMC totaling almost $4 million, based on the contention that Bill's capital contribution in the form of the Promissory Note rather than cash was impermissible, and (2) allegedly improper allocation of the Disputed Costs to LLC members, based on the contention that the operating agreements required that "[s]ales expenses of any kind" be allocated to the manager alone. Dennis alleged that his share of the improper distributions was almost $225,000, and that his share of the Disputed Costs was approximately $6,700.[2]

---

[2]        This is the third lawsuit between the parties arising out of these two oi-and-gas investment ventures. In the first two suits, Dennis sought access

**¶8**        The parties filed cross motions for partial summary judgment on the Disputed Costs issue based on their competing interpretations of the "sales expenses" provision, and Bill and HMC moved for partial summary judgment on all other claims asserting (among other grounds) that the Promissory Note was a permissible capital contribution. The superior court granted summary judgment in favor of HMC and Bill on all claims.

**¶9**        In addition to awarding attorney's fees, the superior court awarded HMC and Bill costs, including both taxable costs and $30,805 in expert accounting fees "pursuant to the operating agreement." The court entered final judgment to that effect, and Dennis timely appealed. We have jurisdiction under Arizona Revised Statutes ("A.R.S.") § 12-2101(A)(1).[3]

## DISCUSSION

### I.    Summary Judgment.

**¶10**        Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ariz. R. Civ. P. 56(a); *Orme Sch. v. Reeves*, 166 Ariz. 301, 305 (1990). We review the grant of summary judgment de novo, viewing the facts in the light most favorable to the party against which judgment was entered. *Wells Fargo Bank, N.A. v. Allen*, 231 Ariz. 209, 213, ¶ 14 (App. 2012). Both of the superior court's rulings that Dennis challenges on appeal involved matters of contract interpretation, which we review de novo. *See Miller v. Hehlen*, 209 Ariz. 462, 465, ¶ 5 (App. 2005).

**¶11**        The cornerstone of contract interpretation is determining and enforcing the parties' intent, considering the contract as a whole and avoiding, if possible, a construction that renders part of the contract superfluous. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 153, 158 n.9 (1993); *ELM Ret. Ctr., LP v. Callaway*, 226 Ariz. 287, 291, ¶ 18 (App. 2010). To ascertain the parties' intent, the court begins with the plain language of the contract. *Grosvenor Holdings, L.C. v. Figueroa*, 222 Ariz. 588, 593, ¶ 9

to the companies' books and records. *See generally Hankerson v. Hankerson Mgmt. Co., LLC*, 1 CA-CV 12-0239, 2013 WL 1319885 (Ariz. App. Apr. 2, 2013) (mem. decision); *Hankerson v. Hankerson Mgmt. Co., Inc.*, 1 CA-CV 08-0753, 2009 WL 3835290 (Ariz. App. Nov. 17, 2009) (mem. decision). The other members have not joined in any of Dennis's claims against Bill.

[3]        Absent material revision after the relevant date, we cite a statute's current version.

(App. 2009). Because "[t]he meaning that appears plain and unambiguous on the first reading of a document may not appear nearly so plain" in light of surrounding circumstances, the court may consider extrinsic evidence to determine the intended meaning if the contract's language is "reasonably susceptible" to the proposed interpretation. *Taylor*, 175 Ariz. at 154. Whether the contract is reasonably susceptible to multiple interpretations based on extrinsic evidence is a question of law for the court. *In re Estate of Lamparella*, 210 Ariz. 246, 250, ¶ 21 (App. 2005) (as amended). The final construction of an ambiguous contract term, however, is a question of fact for the jury. *Pasco Indus., Inc. v. Talco Recycling, Inc.*, 195 Ariz. 50, 62, ¶ 52 (App. 1998).

### A. Promissory Note.

**¶12** Dennis argues that disputed issues of fact should have precluded summary judgment on his claims premised on his allegation that the Two Deuces partnership (and operating) agreement did not permit a managing general partner's capital contribution in the form of a promissory note. Dennis alleged that Bill had received "[i]mproper distribution[s] . . . for his unpaid 'subscription receivable['] in Two Deuces." The theory Dennis presented disputed the propriety of using a promissory note as the manager's contribution at all, and he asserted that the unpaid Promissory Note effectively left the contribution outstanding and unpaid, such that the distributions Bill received should instead have been allocated to the paying partners/members.

**¶13** The Two Deuces partnership agreement required the managing general partner to "make contributions to the capital of the Partnership with respect to his Managing General Partner's interest in the Partnership such that his contribution equals 1 % of the total contributions (including his contribution)." Unlike the provision governing investors' initial capital contributions—which specified payment partially in cash upon subscription and partially "by execution of an interest bearing installment promissory note calling for monthly installments" until paid in full—the agreement did not specify a particular form or a particular deadline for the managing general partner's contribution.[4]

---

[4] The relevant provisions under the Two Deuces operating agreement similarly required the manager to "make contributions to the capital of the Company with respect to its Manager's interest in the Company such that its contribution equals 1% of the total contributions (including its

**¶14** By not specifying a form of contribution, the agreement essentially authorized the managing general partner to contribute in any form authorized under Arizona law, which specifically allows partners' contributions in the form of "a promissory note or other obligation to contribute cash or property or to perform services." A.R.S. § 29-327; *see also* A.R.S. § 29-701(a) (authorizing issuance of an interest in an LLC "in exchange for a capital contribution or an enforceable promise to make a capital contribution in the future, or both"). And allowing the managing general partner to make his contribution by means of a promissory note was also consistent with the agreement's terms contemplating that a portion of the investors' contributions would be through promissory notes.

**¶15** Dennis asserts that, because the partnership agreement defined "Partnership Capital" as the "aggregate cash contributed," the managing general partner's contribution was required to be in cash as well. But the definition of "Partnership Capital" does not necessarily dictate the permissible form or method through which a partner may satisfy his contribution, particularly where (as here) a specific provision detailed requirements for the form of investors' contributions. Moreover, even assuming this definition did apply to the capital contribution provisions, it would simply contemplate *some* (not necessarily all) cash contributions, which is consistent with the requirement that the investor partners contribute cash along with a promissory note, regardless of the form of the managing general partner's contribution.

**¶16** Dennis further contends that, because the agreement defines "Capital Contributions" as "money or property" contributed by the partners, the managing general partner's contribution cannot take the form of a promissory note. But the agreement specifically authorized—and required—the investors' initial capital contributions to be (in part) in the form of promissory notes. Reading these terms so as to harmonize them, *see ELM Ret. Ctr.*, 226 Ariz. at 291, ¶ 18, a promissory note is necessarily within the ambit of "money or property" contemplated by the definition. Accordingly, the partnership agreement did not prohibit capital contributions in the form of a promissory note.

**¶17** Dennis also asserts that the disparate terms as between the investors' promissory notes (required to be an "interest bearing installment

contribution)." The members' initial capital contributions that had been "paid or conveyed to the Company" were described as "cash and a Promissory Note in the aggregate amount set forth in the Subscription Agreement."

promissory note calling for monthly installments" for six months until paid in full) and Bill's Promissory Note (payable on demand but without any other specified due date or payment schedule) create an issue of fact as to breach of fiduciary duty that itself should have precluded summary judgment. But Dennis did not assert this theory before the superior court, and we decline to address it for the first time on appeal. *See Dillig v. Fisher*, 142 Ariz. 47, 51 (App. 1984); *see also Trantor v. Fredrikson*, 179 Ariz. 299, 300 (1994).

¶18 Dennis's fiduciary duty claim—both as asserted in his complaint and as later described in his disclosure statement—was not based on the differences between the parties' promissory notes, but rather on "improper . . . distributions" due to Bill's alleged failure to make a permissible capital contribution. Dennis did not raise the disparate terms until his response to HMC and Bill's motion for partial summary judgment, and even then he did so only in with regard to the applicability of the economic loss rule, a different asserted basis for summary judgment. His argument with regard to the basis for summary judgment relevant here continued to be premised on the theory that the Promissory Note was an impermissible form of contribution. Accordingly, we decline to consider Dennis's new theory relating to an alleged breach of fiduciary duty, and Dennis has not shown that the superior court erred by entering summary judgment based on the Promissory Note.

### B. Sales Expenses.

¶19 Dennis asserts that the superior court erred by granting summary judgment in favor of HMC on his claims related to an alleged misallocation of sales expenses. Dennis's complaint asserted that HMC had incorrectly apportioned final expenses from the sale of the companies' assets (the Disputed Costs categorized as "Costs Incurred after effective date but allocable to cost of Sale" in an internal reconciliation document prepared by each company) by charging the expenses to the members of the LLCs rather than bearing the full cost itself.

¶20 Section 5.6.7 of Jackpot and Two Deuces' identical operating agreements provides that "Sales expenses of any kind shall be borne by the Manager." In granting summary judgment in favor of HMC and Bill, the superior court reasoned that "sales expenses of any kind" could not reasonably be read to include expenses relating to the sale of the companies' assets. But the provision itself reflects no such limitation and instead is written expansively to encompass "any kind" of sales expenses and,

perhaps, any kind of sale. Thus, Dennis's interpretation was not unreasonable on its face.

¶21　　　　HMC and Bill argue that both the structure and terms of the operating agreements as well as extrinsic evidence show that this provision allocating all "Sales Expenses" to the manager refers only to expenses incurred in connection with the initial offering of interests in Jackpot and Two Deuces in 1989 and 1991, respectively, not to any other "sales." They contend that the term "sales expenses" as used in Section 5.6.7 is defined and limited by Section 5.1.7, a provision in the definitions portion of Section 5 of the operating agreement defining "Certain Selling Expenses" as "Selling expenses paid for services in connection with and expenses of the Distribution of the Offering all to be borne by Manager."

¶22　　　　As an initial matter, the two provisions use strikingly different language of scope. Section 5.1.7 refers to "Certain Selling Expenses," suggesting that the agreement elsewhere contemplated other selling expenses beyond those related to the initial offering. Section 5.6.7, in contrast, uses expansive language to encompass sales expenses "of any kind." Although not dispositive on summary judgment, the language indicates a different apparent scope, suggesting Section 5.6.7 may include expenses beyond those contemplated by Section 5.1.7.

¶23　　　　As HMC and Bill point out, however, the term "Certain Selling Expenses" is not used elsewhere in Section 5, so if the term does not apply to "Sales Expenses" under Section 5.6.7, it would arguably be rendered superfluous. But Section 5.1.7 does more than simply define "Certain Selling Expenses." Although listed in a definitions section, it includes a substantive clause mandating that these expenses relating to the initial offering are "all to be borne by Manager." Because Section 5.6.7 also provides that the sales expenses "shall be borne by the Manager," Section 5.6.7 would be unnecessary if it refers only to the same expenses as Section 5.1.7. Each alternative interpretation thus creates a form of surplusage, while avoiding the form created by the other interpretation. *See ELM Ret. Ctr.*, 226 Ariz. at 291, ¶ 18.

¶24　　　　HMC and Bill posit that the structure of Section 5 is such that the definitions are set forth in the same order as the substantive allocation provisions; that is, the definition in Section 5.1.1 corresponds to the substantive provision in Section 5.6.1 (Operating Costs), and the definition of "Certain Selling Expenses" in Section 5.1.7 should thus correspond to the substantive provision of "Sales Expenses" under Section 5.6.7. But not all of the definitions and substantive allocation terms actually correspond in

that manner. While potentially persuasive, this structural argument is not enough to establish that HMC and Bill's interpretation is correct as a matter of law.

**¶25** HMC and Bill further reference the initial offering documents, in which a summary chart lists "Selling Expenses" only within the partnership's organizational stage (relevant to the initial offering), not during the operational stage (as would be relevant to sale of assets). But the next summary chart in the same document lists "Organization and Offering Costs" separately from "Sales Commission and Expenses," allocating both to the managing general partner alone. At most, the organization documents lend credence to Bill's proposed interpretation, but do not form a basis for adopting HMC and Bill's version as a matter of law.

**¶26** Although the superior court correctly concluded that the sales expenses terms was reasonably susceptible to HMC and Bill's alternative interpretation, *see Taylor*, 175 Ariz. at 153, the court erred by concluding as a matter of law that Dennis's interpretation was unreasonable. Because the parties both presented plausible interpretations of the sales expenses term, the construction of the term is a question of fact for the fact-finder, *see Pasco Indus.*, 195 Ariz. at 62, ¶ 52, and the court erred by entering summary judgment on this basis.[5]

## II.     Expert Accounting Fees.

**¶27** Finally, Dennis argues that the superior court erred by assessing expert accounting fees as "costs" awarded to HMC and Bill. We generally review the court's determination and calculation of costs for an abuse of discretion. *Berry v. 352 E. Virginia, L.L.C.*, 228 Ariz. 9, 15, ¶ 31 (App. 2011). We review matters of contract interpretation de novo. *Miller*, 209 Ariz. at 465, ¶ 5.

**¶28** At HMC and Bill's request, the superior court awarded them costs that included $30,805 in expert accounting fees, ostensibly "pursuant to the operating agreement." The identical operating agreements for

---

[5] HMC and Bill further argue that only a small portion of the Disputed Costs were in fact related to a "sale" of any kind, and that most were actually subject to allocation as direct costs, continuing management fees, and operating costs instead. Our ruling does not address classification of the Disputed Costs, and we defer to the superior court to address any such argument on remand.

Jackpot and Two Deuces included indemnification provisions providing that:

> the Company shall indemnify the Manager or such other person [shareholder, director, officer, or employee of the Manager] against expenses, including, without limitation, attorneys' and accountants' fees . . . reasonably incurred by the Manager or such other person in connection with [litigation related to the company].

¶29      Dennis argues that the award was improper because expert fees do not qualify as taxable costs under A.R.S. § 12-332, and Bill and HMC agree that the expert fees were awarded under contract, not as taxable costs. Dennis further asserts that the terms of the operating agreement(s) did not authorize the award. We agree.

¶30      The indemnification provisions are not fee-shifting provisions as between the parties to litigation regarding Jackpot and Two Deuces. Rather, by their terms, the operating agreements bind only "the Company" (Jackpot or Two Deuces)—not an adverse litigant—to indemnify the company's manager (HMC). Although Dennis agreed to the terms of the operating agreements, those terms provide for the companies, not an individual member, to indemnify the manager for litigation expenses. Accordingly, we vacate the portion of the cost award representing expert accounting fees in the amount of $30,805.

## III.    Attorney's Fees on Appeal.

¶31      Both Dennis and HMC/Bill request an award of attorney's fees on appeal under § 12-341.01, and both sides agree that all of the claims at issue arise out of contract. In an exercise of our discretion, and in light of each side's partial success on the merits, we decline both requests for fees.

## CONCLUSION

¶**32**      For the foregoing reasons, we affirm the judgment in part, but reverse summary judgment regarding sales expenses, vacate the award of expert accounting fees, and remand for further proceedings.



Ruth A. Willingham · Clerk of the Court
FILED: ama