**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ANIL VAZIRANI; SECURED
FINANCIAL SOLUTIONS, LLC;
VAZIRANI & ASSOCIATES
FINANCIAL, LLC,

       Plaintiffs - Appellants,

v.

MARK V. HEITZ; JORDAN
CANFIELD,

       Defendant - Appellees.

No.  12-3183

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 6:09-CV-01311-MLB)**

---

David G. Bray, Dickinson, Wright, Mariscal, Weeks, Phoenix, Arizona (Amy Fellows
Cline, Triplett Woolf & Garretson, LLC, Wichita, Kansas, with him on the briefs), for
Plaintiffs – Appellants.

Michael L. Parrish (Sarah K. Langenhuizen, with him on the brief), Stinson Morrison
Hecker LLP, Phoenix, Arizona, for Defendants – Appellees.

---

Before **HARTZ, BALDOCK,** and **EBEL,** Circuit Judges.

---

**HARTZ**, Circuit Judge.

_____

Anil Vazirani is an independent insurance agent, also known as a producer, who contracts with insurance companies to sell life-insurance and annuity products. He owns and manages Vazirani & Associates Financial, LLC and Secured Financial Solutions, LLC. We will refer to both him and his businesses as Vazirani. Vazirani contracted with Aviva Life and Annuity Company, a provider of life-insurance and annuity products. After Defendants Mark Heitz and Jordan Canfield, executives at Aviva, cancelled the contract, Vazirani sued them in federal district court, alleging that they tortiously interfered with the contract. The district court awarded summary judgment to Defendants. It ruled that an officer of a company could be liable for tortious interference with a company contract only if he was motivated by solely personal interests and that Vazirani had failed to produce evidence that Defendants were motivated by solely personal interests in terminating the contract. Vazirani appeals. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I.      BACKGROUND

Aviva usually did not sell its life-insurance and annuity products to consumers directly, but instead contracted with agents who would make the sales to individuals, families, and businesses. Vazirani entered into his contract with Aviva in 2005. The contract allowed either party to terminate the relationship with written notice at any time, with or without cause. While it was in effect, Heitz served as Aviva's President of Sales

and Distribution, and Canfield served in a number of executive positions, including Executive Vice President of Sales and Distribution. Both Heitz and Canfield had the authority to terminate Aviva's contracts with producers such as Vazirani.

Vazirani made direct sales of insurance products to consumers, for which he received commissions from Aviva. He could also recommend to Aviva that it contract with other agents, who would then sell Aviva products. If Aviva accepted these agents, they became part of Vazirani's "downline," and Vazirani would receive commissions on their sales as well. Vazirani's organization thus had several functions: (1) to sell products, (2) to recruit agents, and (3) to provide marketing and sales support to the agents in his downline. The parties refer to organizations that carry out such functions as independent marketing organizations (IMOs). In addition to Vazirani, Aviva worked with a number of other IMOs at the time, including Advisors Excel, LLC, and Financial Independence Group (FIG).

Aviva's annuity products were marketed in a variety of ways. Those in the Annexus product line, which Aviva developed with another insurance company, Annexus Distributors AZ, LLC, were issued by Aviva, but IMOs contracted directly with Annexus Distributors to sell them. Annexus Distributors made the sole decisions over who would be authorized to market and sell these products. Some of Aviva's IMOs, including Advisors Excel and FIG, were authorized, but other IMOs were not. Vazirani did not have a contract with Annexus Distributors to market the products but could sell them as an agent for FIG, which paid Vazirani commissions on the sales. Annexus Distributors

3

also authorized FIG to pay Vazirani commissions on some sales of the products by his downline agents. But Vazirani could not market or advertise the Annexus products to any agent.

In 2008, Vazirani and Aviva began to experience strains in their working relationship. Defendants contended that Vazirani broke four Aviva rules. First, Advisors Excel reported to Aviva in early 2008 that Vazirani had offered Lee Hyder, one of its downline agents, a higher commission if Hyder would work for Vazirani instead. Aviva had a rule that prohibited producers from recruiting agents from other IMOs by offering them a higher commission on sales of the same products. Canfield thought about terminating Vazirani for the violation, but only disciplined him. Vazirani admits that he discussed contracting with Hyder, but he contends that he did not break the rule because he promised only that Hyder *might* receive a higher commission. He also suggests that somehow in the Hyder interaction he had been "set . . . up for termination." Aplt. App., Vol. III at 344–45 (internal quotation marks omitted). But he fails to explain how he was set up, and he presents no evidence of any inducement by others that he engage in the misconduct.

Second, Aviva was told by Advisors Excel in the summer of 2008 that Vazirani had paid Matt Rettick and his organization, Covenant Reliance Producers (CRP), a marketing reimbursement for providing training, trips, gift programs, and other expenses for Vazirani's agents. Defendants were concerned that this broke an Aviva rule prohibiting agents from making side deals that allowed payments on Aviva sales to be

made to groups, such as CRP, that did not have contracts with Aviva. Aviva terminated its contract with at least one other IMO because the IMO apparently had such a prohibited arrangement with CRP. Vazirani admits that he paid CRP, but claims that the payments related to sales of CRP products, not Aviva products.

Third, Vazirani sent an improper e-mail to his agents on August 19, 2008. Vazirani's contact at FIG, Phil Graham, had drafted an e-mail to encourage agents already in Vazirani's downline to become more familiar with Annexus products and to start selling them. But before Graham had a chance to send the e-mail, Vazirani sent it with his own edits, stating that it was from Graham on behalf of Vazirani. Graham never authorized Vazirani to send the e-mail, and Vazirani admits that he should not have made it seem that the e-mail came from Graham. Annexus Distributors had the sole right to approve agents to market the Annexus products, and their agreement with FIG did not allow Vazirani to market the products to agents. Advisors Excel received a copy of the e-mail from one of its downline agents and forwarded it to Aviva.

Fourth, on October 23, 2008, Vazirani submitted a transfer request to Advisors Excel, asking that one of its agents be transferred to his downline to sell Annexus products. Defendants assert that Vazirani was not allowed to make transfer requests for agents selling Annexus products. Vazirani does not present any evidence or argument to show that the transfer request was not a rule violation.

Vazirani's third and fourth rule violations, which concerned Annexus products, caused problems between Aviva and Annexus Distributors. Ron Shurts, an executive of

Annexus Distributors, was upset when he learned of the August 19 e-mail, and Phil Graham at FIG was concerned that the e-mail could cause Annexus Distributors to terminate FIG's contract to sell Annexus products because the e-mail violated FIG's exclusivity agreement with Annexus Distributors. Defendant Canfield heard about the dispute and was also worried about FIG's losing its authority to market the products. Then, when Annexus Distributors received a copy of the October transfer request, Shurts wrote angrily to Canfield, saying that Vazirani should be terminated.

About a week later, on November 6, 2008, Canfield called Vazirani to notify him that Aviva would be terminating Vazirani's contract as well as the downline contracts of his agents. During the phone call Canfield stated that Aviva had concerns about Vazirani's business practices and that it had received complaints from other agents about him. But Canfield also stated that the complaints were "not the overall reason for this decision being made," *id.*, Vol. II at 336, and that Aviva wanted to focus on its "key groups," *id.* at 332, or "big core groups," *id.* at 338. Aviva sent Vazirani written notice in February 2009 that it was terminating its contract with him, effective April 1, 2009. The notice specified that the termination was not a "with cause" termination. About that time, Aviva also sent written notices to all of Vazirani's downline agents, terminating their contracts as well.

In the meantime, Vazirani's attorneys had sent letters to a law firm representing Aviva to seek an explanation for the termination. The letters had threatened litigation. In March 2009, Aviva's law firm responded in a letter that included the following:

6

> While Aviva certainly has business reasons for terminating Mr. Vazirani's producer contracts, it was not required to. As spelled out below, Mr. Vazirani's contracts were terminated due to a change in Aviva's distribution strategy and as a result of market forces that have caused Aviva to exert control over exponential growth in annuity sales.
>
> * * *
>
> Aviva decided to terminate Mr. Vazirani and his downlines in the initial stages of the deferred annuity sales bubble. His termination was part of Aviva's attempt to *focus on core marketing groups* and producers in order to exert control on burgeoning annuity sales. As time has progressed over the last two months, however, Aviva has initiated even more significant measures to deemphasize annuity sales and redirect sales focus to the company's life insurance product lines. Aviva's actions to control the flow of new annuity sales has [sic] nothing to do with Mr. Vazirani or his group. Nor does it have anything to do with alleged communications by . . . Annexus Group or others.

*Id.*, Vol. III at 379 (emphasis added). To support this explanation, Defendants have produced evidence that (1) in the fourth quarter of 2008, Aviva had taken steps to slow its annuity sales by terminating thousands of agent contracts, (2) that this strategy was prompted by a desire to preserve capital in light of the economic crisis and by an increase in consumer demand for fixed-index annuities, and (3) that among those terminated were groups that sold the same products as Vazirani.

In October 2009, Vazirani filed suit in the United States District Court for the District of Kansas. The amended complaint named Heitz and Canfield as defendants, claiming that they (1) tortiously interfered with Vazirani's contractual relationship with Aviva; (2) tortiously interfered with Vazirani's business expectancies; (3) entered into a civil conspiracy to tortiously interfere with Vazirani's contract with Aviva and Vazirani's

7

business expectancies; (4) aided and abetted in each other's tortious acts; (5) defamed Vazirani; and (6) committed trade libel. The district court dismissed the defamation and trade-libel claims for failure to state a claim.

Defendants later filed a motion for summary judgment on all remaining claims, which the district court granted. The court said that under the applicable law on tortious interference, Vazirani had to show that the actions of Canfield or Heitz, as officers of the contracting party, were motivated by a purely personal interest, but he had failed to produce evidence that they were motivated by *any* personal interest. Without the tortious-interference claims, the conspiracy and aiding-and-abetting claims also failed.

Vazirani raises one argument on appeal: that the district court erred in granting summary judgment because he presented enough evidence that a jury should have been permitted to decide the tortious-interference claims. We disagree.

## II. DISCUSSION

We review the district court's order of summary judgment de novo, applying the same standard that the district court should have applied. *See Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "view[ ] all facts in the light most favorable to the party opposing summary judgment." *Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008).

8

The district court found that Arizona law applies to this diversity case, and neither party contests that determination. In Arizona the elements of tortious interference with contract, generally called intentional interference with contractual relations, are: "(1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly." *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 31 (Ariz. 2002). The elements of tortious interference with a business expectancy are essentially the same. *See S. Union Co. v. Sw. Gas Corp.*, 165 F. Supp. 2d 1010, 1040 n.36 (D. Ariz. 2001); Restatement (Second) of Torts § 766 cmt. c (1979). Therefore we will follow the approach of the district court and consider these claims together.

Vazirani's complaint accused Defendants of interfering with a contract between their employer and Vazirani. The parties agreed in the pretrial order that for both of the tortious interference claims, Vazirani had to prove that "Heitz (or, for the claim against Canfield, Canfield) acted outside the course and scope of his employment with Aviva." Aplt. App., Vol. I at 134. This requirement follows from Arizona law that "[d]efendants who are acting within the scope of their authority, for the benefit of their employer, are the employer and cannot interfere with their own contract." *Spratt v. N. Auto. Corp.*, 958 F. Supp. 456, 464 (D. Ariz. 1996) (citing Arizona cases); *see also Campbell v. Westdahl*,

9

715 P.2d 288, 294 (Ariz. Ct. App. 1985) ("A party cannot be held liable in tort for intentional interference with its own contract.").

In its order granting summary judgment, the district court stated that to establish that Defendants could be liable for interfering with their own company's contract, Vazirani had to show that "[D]efendants actions' [sic] were so contrary to Aviva's interests that they could only have been motivated by personal interests." *Vazirani v. Heitz*, 876 F. Supp. 2d 1249, 1258 (D. Kan. 2012) (internal quotation marks omitted). Vazirani has not challenged this standard in his briefs on appeal, and his counsel at oral argument volunteered that the standard is "purely selfish, personal reasons." We will therefore assume that Vazirani had to prove that Defendants acted for their own purely personal reasons without any motivation to serve Aviva.

The evidence that defendants were motivated by business reasons when they terminated Vazirani's contract with Aviva is compelling. Vazirani argues that he was such a good salesman, such a productive producer, that only inappropriate personal motivations could explain the cancellation. But it was precisely Vazirani's efforts at competing that had generated complaints against him. It is one thing to follow the rules and have great success. It is quite another to cheat. The complaints against Vazirani related to unfair competition—trying to steal productive agents from competitors (contrary to Aviva's rules) and infringing on exclusive rights granted to other agents.

Moreover, Canfield also stated a second reason for the termination. Aviva was concerned that it lacked the capital to support the sharp rise in demand for annuities. To

10

reduce its sales, it cancelled contracts with thousands of its agents. Vazirani's productivity was irrelevant (or, perhaps, was a negative factor) with respect to this other reason for terminating his contract. There is no evidence that Vazirani was discriminated against in this regard; he has pointed to no comparable producer whose contract was continued.

Vazirani also suggests that personal animus, even racism, motivated Defendants. But there is no supporting evidence. Neither Defendant used racist or similar derogatory language in any communication in the record.

Another of Vazirani's theories is that Defendants terminated Vazirani to please the founders of Advisors Excel because of personal business and fraternal ties. This theory is also too speculative to preclude summary judgment. The personal business that allegedly motivated Canfield was the prospect of joining a venture with the Advisors Excel founders. In August 2009, Canfield went into business with the founders of Advisors Excel to form a new company, Innovation Design, which was located within Advisors Excel's headquarters for its first two years. But Vazirani has produced no evidence that this transition was on anyone's radar screen in November 2008 when Canfield notified Vazirani that his contract would be terminated. Canfield swore in an affidavit that he did not consider leaving Aviva until April or May of 2009 and then considered multiple offers before deciding on Innovation Design. The other founders of Innovation Design all swore in affidavits that they did not know Canfield was considering leaving Aviva until April or May of 2009. Vazirani points to no contradicting evidence.

11

As for fraternal ties, Vazirani notes that the founders of Advisors Excel graduated from Washburn University in 1998 and 1999, and Heitz and Canfield graduated from Washburn University in 1974 and 1996 respectively. Heitz and two of the founders of Advisors Excel were members of the Sigma Phi Epsilon fraternity, although they joined almost 25 years apart. Again, however, there is no evidence that Defendants had any contact with the founders based on their connections with Washburn or Sigma Phi Epsilon, or even knew of these connections, much less that these connections influenced Canfield's decision.

The only remaining personal motive to cancel the contract attributed by Vazirani to Defendants is that he was terminated for his whistleblowing activities. Vazirani's briefs devote only a few words (not a full sentence) to the claim, and for good reason. The district court refused to consider the retaliation theory as a ground for denying summary judgment because Vazirani did not mention the theory or its alleged factual basis in the pretrial order. Vazirani does not challenge that ruling on appeal. We therefore refuse to consider the claim. *See Orr v. City of Albuquerque*, 417 F.3d 1144, 1154 (10th Cir. 2005) (when district court rejected appellant's claim on ground A and appellant, without challenging that ruling, argues only that the claim could not be rejected on ground B, this court need not address the argument).

Finally, Vazirani argues that we can infer that Defendants must have had an improper personal motive to terminate him because Aviva gave a false explanation for the termination. He relies on the letter sent to his attorney in March 2009 from the law

firm representing Aviva. He contends that the letter is false in two respects. First, he says, the reason given in the letter—to focus on core marketing groups so that Aviva could limit annuity sales—could not have been the actual reason. But, as we have already stated, Vazirani has produced no evidence to controvert that explanation.

Second, Vazirani suggests that the letter falsely denies that the actual reason for the termination was illegitimate complaints from other producers. The pertinent portion of the letter states: "Aviva's actions to control the flow of new annuity sales has [sic] nothing to do with Mr. Vazirani or his group. Nor does it have anything to do with alleged communications by . . . Annexus Group or others." Aplt. App., Vol. III at 442. We are not so sure, however, that these two sentences deny that Vazirani's alleged misconduct influenced his termination. The letter seems to carefully (and perhaps not candidly) avoid saying that Vazirani's termination had nothing to do with complaints about him. It states only that the "actions to control the flow of new annuity sales," *id.*, as opposed to the termination of his contract in particular, had nothing to do with Vazirani or communications from others about him.

In any event, even if the letter does not fully explain Aviva's motives for the termination, it does not undermine the summary judgment. True, a pretextual reason for an employer's decision to fire or discipline an employee can support a finding that the employer's motive was prohibited discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). But whether such evidence of pretext suffices to preclude summary judgment depends on "the strength of the plaintiff's prima facie case,

13

the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148–49. "It is not always permissible for the factfinder to infer discrimination from evidence that the employer's explanation is unworthy of belief." *DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1163 (10th Cir. 2009) (brackets, emphasis, and internal quotation marks omitted). "[O]ur inquiry is not mechanistic; it is designed to tease out factual questions that are legitimately in dispute. And summary judgment is appropriate where the plaintiff cannot demonstrate any genuine dispute of material fact for the jury to resolve." *Lobato v. N.M. Env't Dep't*, No. 12-2128, 2013 WL 5912072, at * 4 (10th Cir. Nov. 5, 2013).

Here, a reasonable juror could not believe that Defendants' motives for terminating Vazirani's contract were all unrelated to the business needs of Aviva. To begin with, both the lawyer's letter and Canfield's November conversation with Vazirani gave a business reason—focusing on Aviva's core groups—that is uncontroverted (at least not by evidence, as opposed to Vazirani's speculation) and led to terminations of thousands of other agents. Second, the evidence supporting the other reason given by Canfield—Vazirani's improper business practices—is compelling, and uncontradicted in its essentials. The omission of that reason from the lawyer's letter is interesting. But there is no evidence that Defendants endorsed, or even knew of, the letter's language.

Most importantly, there is no evidence to support a personal agenda of either Defendant that motivated the termination. When evidence of pretext supports denial of a

summary judgment in favor of an employer accused of discrimination, the plaintiff must have already established a prima facie case of discrimination. *See Reeves*, 530 U.S. at 148 ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.") True, the evidentiary requirements for a prima facie case of discrimination are not demanding, *see Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013); but Vazirani has provided nothing resembling such evidence. And, although making this point may seem like piling on, Vazirani needs to prove more than just that Defendants had personal motivations; he must prove that they had *no* business motives, despite the compelling reasons to terminate him.

In short, the attorney's letter is too slim a reed to support the inferences needed for Vazirani to prevail. The district court properly granted summary judgment.

## III. CONCLUSION

We affirm the district court's grant of summary judgment for the defendants.