NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

ANIL VAZIRANI, an individual; SECURED FINANCIAL SOLUTIONS, LLC, an Arizona limited liability company, *Plaintiffs/Appellants/Cross-Appellees*,

*v.*

ANNEXUS DISTRIBUTORS AZ, LLC, an Arizona limited liability company; RONALD L. SHURTS, an individual; ADVISORS EXCEL, LLC, a Kansas limited liability company; CREATIVE ONE MARKETING CORPORATION, a Kansas corporation, *Defendants/Appellees/Cross-Appellants*.

No. 1 CA-CV 14-0815
FILED 8-9-2016

---

Appeal from the Superior Court in Maricopa County
No. CV2009-010331
The Honorable David O. Cunanan, Judge

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**

---

COUNSEL

Dickinson Wright PLLC, Phoenix
By David G. Bray, Todd A Baxter
*Counsel for Plaintiffs/Appellants/Cross-Appellees*

Ryley Carlock & Applewhite PA, Phoenix
By Rodolfo Parga, Jr., Clarke H. Greger, Andrea G. Lovell
*Counsel for Defendants/Appellees/Cross-Appellants Annexus and Shurts*

Jennings Strouss & Salmon PLC, Phoenix
By Garrett J. Olexa
*Counsel for Defendant/Appellee/Cross-Appellant Advisors Excel*

Stinson Leonard Street LLP, Phoenix
By Michael L. Parrish, Brandon R. Nagy
*Counsel for Defendant/Appellee/Cross-Appellant Creative One Marketing*

---

## MEMORANDUM DECISION

Judge Donn Kessler delivered the decision of the Court, in which Acting Presiding Judge Kent E. Cattani and Judge Lawrence F. Winthrop joined.

---

**K E S S L E R**, Judge:

¶1 Anil Vazirani ("Vazirani") and Secured Financial Solutions, LLC ("SFS") (collectively, "Appellants"), appeal from a series of summary judgments dismissing their second amended complaint against Annexus Distributors AZ LLC ("Annexus") and Ronald L. Shurts (collectively "Annexus Defendants"), Advisors Excel LLC ("Excel"), and Creative One Marketing Corporation ("Creative") (collectively, "Appellees"). Appellees cross-appeal from an order denying portions of their request for costs. For the reasons stated below, we affirm in part, reverse in part, and remand for further proceedings consistent with this decision.

### FACTUAL AND PROCEDURAL HISTORY

¶2 After a series of alleged disparaging remarks made by Appellees, Appellants brought this action for defamation per se,[1] tortious interference with contract, tortious interference with business expectancies,

---

[1] The record does not show that Appellants ever filed an amendment or sought to assert a defamation claim as opposed to defamation per se claims. Appellants stated at oral argument on appeal that they had limited their claim on this theory to one for defamation per se.

and injurious falsehood against all the defendants. Appellants also asserted a claim of trade libel against the Annexus Defendants. In a second amended complaint,[2] Appellants alleged that SFS was an independent marketing organization ("IMO") that contracts with insurance companies to distribute those companies' products including Aviva Life & Annuity Company and/or its predecessor entities American Investors and AmerUS ("Aviva"). The complaint alleged that Vazirani, as the president and CEO of SFS,[3] was the main catalyst of SFS and played a key role in its marketing. As discussed in more detail below, Appellants alleged that the Appellees sought to have Aviva terminate its relationship with SFS by: (1) Excel spreading false rumors at a trade meeting in Kansas that SFS and Vazirani had engaged in illegal conduct in their business leading to a government investigation and that they would be "shut down"; (2) Creative making similar statements to Aviva, its parent company; and (3) the Annexus Defendants falsely disparaging Vazirani to Aviva over an email SFS had sent out and to a company with whom SFS did business, the Financial Independence Group ("FIG") and telling FIG it would have Aviva cancel Vazirani's contracts.

¶3            Appellants alleged that based on complaints Aviva had received about Vazirani's business practices, Aviva terminated Vazirani's at-will contract with Aviva as well as the contracts he had with downline agents ("Vazirani's contracts"). The complaint alleged that Aviva falsely told Vazirani that its decision was based on its need to focus on key core groups, although it admitted Aviva's relationship with Vazirani had been strained since it received complaints from other IMOs about his business practices. The complaint alleged that after terminating the at-will contract, Aviva falsely informed Vazirani that it had terminated his contract as part of an effort to reduce annuity sales and to redirect sales to its life insurance

---

[2]        The superior court earlier dismissed a trade libel claim against Excel, and Appellants expressly state they are not appealing that order. SFS also stated it is not appealing the order dismissing its defamation per se claim against Excel. Appellants additionally waived the issue of the trial court's dismissal of their claim for injurious falsehood by not addressing it in their opening brief on appeal. *See Dawson v. Withycombe,* 216 Ariz. 84, 100 n.11, ¶ 40 (App. 2007) (stating that "an issue preserved on appeal, but not argued in an appellant's opening brief, is waived").

[3]        Vazirani is the sole member of SFS.

product lines, which had nothing to do with Vazirani, SFS, or any alleged communications from Creative, Annexus Defendants, or others.

¶4 While this case was pending, Vazirani, SFS, and another Vazirani limited liability company, Vazirani & Associates Financial ("the *Heitz* plaintiffs"), sued two officers of Aviva, Mark Heitz and Jordan Canfield ("the *Heitz* defendants"), in the United States District Court for the District of Kansas. *See Vazirani v. Heitz*, 741 F.3d 1104, 1105 (10th Cir. 2013) ("*Heitz*"). In that complaint, the *Heitz* plaintiffs alleged that, in response to the same conduct of the Appellees alleged here, the Aviva officers tortiously interfered with Aviva's contractual relationship with SFS by terminating the Aviva contract. *Id.* at 1105-09. The federal district court granted the *Heitz* defendants summary judgment, and the federal court of appeals affirmed. *Id.* at 1105, 1111. Applying Arizona law to the interference with contract claim, the Tenth Circuit Court of Appeals ("Tenth Circuit") held that "a reasonable juror could not believe that [Aviva's] motives for terminating [the *Heitz* plaintiffs'] contract were [sic] all unrelated to the business needs of Aviva," *Id*. at 1108, 1110-11. Those business reasons included Aviva's desire to move out of the annuity market and focus on its core group and other products.[4] *Id*. at 1109.

¶5 Appellees filed a series of summary judgment motions. First, Excel moved for summary judgment on the tortious interference claims and the defamation per se claim. The superior court denied that motion as to the tortious interference claims, but granted it on the defamation per se claims, concluding the statements were not defamatory and they did not relate to SFS. Each defendant then separately moved for summary judgment on all claims against it. The court again denied the motions as to the tortious interference claims based on a genuine dispute of material fact, but it granted the motions on the defamation per se claims, concluding the relevant statements were not actionable as either trade libel (as to the Annexus Defendants, which were the only remaining defendant on that claim), or defamatory under Kansas law. This left only the tortious interference claims against all defendants.

---

[4]     In addition, in 2011, Vazirani and Associates Financial sued Creative, Excel, and Annexus in a separate action in Arizona based on this same conduct. The superior court dismissed that complaint as barred by the statute of limitations and we affirmed. *Vazirani and Assocs. Fin., LLC v. Advisors Excel, LLC*, 1 CA-CV 12-0449, 2013 WL 3009363, at *1 (Ariz. App. June 13, 2013) (mem. decision).

**¶6**      The Appellees moved for reconsideration of their summary judgment motions on the tortious interference claims based on the Tenth Circuit's decision in *Heitz*.   *See id.* at 1110-11.  Defendants argued that *Heitz*'s finding that Aviva had business reasons for terminating the plaintiffs' contract precluded a finding of any genuine issue of material fact as to whether the defendants intentionally interfered with plaintiffs' contract with Aviva and thereby caused the termination of that contract. *See id*.  The trial court granted that motion and entered summary judgment for the Appellees on the tortious interference claims based both upon its review of the motion and of the previously filed motions for summary judgment, thus dismissing the remaining claims.

**¶7**      Appellees then sought an award of taxable costs for expenses incurred in this case.  They requested reimbursement of filing fees, subpoena/witness fees, court reporter fees, videographer fees, private mediator fees, and travel expenses.  The court awarded less than all the costs requested without explanation by signing the proposed form of judgment filed by Vazirani.

**¶8**      Appellants timely appealed from the judgment.  Appellees timely filed a notice of cross appeal on taxable costs.  This Court has jurisdiction over the appeal and cross-appeal pursuant to Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (2016) and 12-2101(A)(1) (2016).

## ISSUES ON APPEAL AND STANDARDS OF REVIEW

**¶9**      Appellants argue that the superior court erred in granting summary judgment on their claims of: (1) defamation per se against Creative and the Annexus Defendants; (2) trade libel as to the Annexus Defendants; and (3) tortious interference with contract and business expectancy as to all the Appellees.

**¶10**      "A trial court should only grant a motion for summary judgment 'if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense.'" *Airfreight Exp. Ltd. v. Evergreen Air Ctr., Inc.*, 215 Ariz. 103, 110, ¶ 19 (App. 2007) (quoting *Orme Sch. v. Reeves*, 166 Ariz. 301, 309 (1990)).

**¶11**      On appeal, we review summary judgment and questions of law *de novo*, *see Andress v. City of Chandler*, 198 Ariz. 112, 114, ¶¶ 5, 7 (App. 2000), including the application of issue preclusion which is a question of law, *see Campbell v. SZL Properties, Ltd.*, 204 Ariz. 221, 223, ¶ 8 (App. 2003)

(issue preclusion reviewed *de novo*). We review the evidence and draw reasonable inferences therefrom in the light most favorable to the party against whom summary judgment was entered. *See Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 308, ¶ 2 (2003); *Angus Med. Co. v Digital Equip. Corp.*, 173 Ariz. 159, 162 (App. 1992). We will affirm the trial court's grant of summary judgment when an appellant has not shown "there exists evidence of genuine issues for trial," *Molever v. Roush*, 152 Ariz. 367, 370 (App. 1986), and when the trial court was correct for any reason argued below and supported by the record, *see City of Tempe v. Outdoor Systems, Inc.*, 201 Ariz. 106, 111, ¶ 14 (App. 2001) ("We may affirm summary judgment even if the trial court reached the right result for the wrong reason.") (citation omitted).

## DISCUSSION

I.    **Additional Facts Concerning the Parties' Relationships and the Alleged Misconduct of Appellees**

¶12       Aviva has several distribution partners, one of which is Excel, a Kansas limited liability company. Creative, a Kansas corporation, also performs distribution functions for Aviva and is Aviva's wholly-owned subsidiary. Aviva has its headquarters and some of its offices located in Kansas. Aviva's Executive Vice President of Sales and Distribution Jordan Canfield ("Canfield"), a resident of Topeka, Kansas, communicated with the parties out of Aviva's Kansas office.

¶13       Annexus, an Arizona limited liability company, developed specialized annuity products with Aviva ("Annexus annuities") and created a group of IMOs ("Annexus Group") with exclusive rights to sell, market and distribute the Annexus annuities. To manage the Annexus Group and to enforce its rules, Annexus negotiated with Aviva a right to cooperate in selecting agents authorized to sell the Annexus annuities.

¶14       Vazirani contracted with Aviva to sell its annuity products through all three of Aviva's distribution channels. Vazirani also executed a contract to sell the specialized Annexus annuities through FIG, a member of the Annexus Group. FIG has a place of business in North Carolina. Its then Senior Marketing Director, Phil Graham ("Graham"), is also a resident of North Carolina.

¶15       As discovery disclosed, SFS did not have a contract with Aviva or with any other insurance company. Vazirani conceded in his depositions that SFS has no assets, employees, agents, income, never kept any books or records, never filed any tax returns and was simply a

6

marketing name used to market Vazirani & Associates Financial, LLC. In a deposition taken in *Heitz*, Vazirani admitted that SFS had no contracts with downline agents, but filed declarations in this case that SFS did have such contracts and testified in deposition that SFS contracted with downline sales agents, providing those agents with marketing materials at no charge. Vazirani testified in a deposition that SFS had value as a brand. For purposes of this appeal, we assume that SFS had sufficient existence to successfully assert the claims made in this action and will refer to SFS and Vazirani interchangeably unless we expressly limit a reference to either Vazirani or SFS.

A. Allegedly Defamatory Statements Made by Annexus Defendants

¶16 During a telephone conversation in October 2008, Ronald L. Shurts ("Shurts"), the general partner of Annexus' sole member, stated to Graham at FIG that: (1) Vazirani is a "f-----g greaseball"; (2) Vazirani "is a total f-----g scumbag. Nobody wants to do business with him. For some reason, you guys got your head up his a--, okay? And he's toast after today. I mean, they're [Aviva] fricking done. They're [Aviva] so f-----g sick and tired of his f-----g bull---t."; (3) "His Aviva's just getting terminated, too."; (4) "He is just done across the board . . . You know, he's just done. I mean, you know. He's just — nobody wants to do business with the guy. I mean, any companies, but they're being held hostage at premium, which I'll vi – I vow to the day of my death that I'll never be held hostage to [sic] premium . . . ."; and (5) Shurts would not "do business with a grease ball like that for a fricking five point override" (a large commission by industry standards). Shurts had not met Vazirani prior to this lawsuit and did not know his business practices outside of Vazirani's contract to sell Annexus annuities.

¶17 In an October 2008 email, Shurts wrote to Canfield at Aviva stating: "Let's terminate this F-----G idiot. I didn't know that Anil [Vazirani] could request transfers." Shurts' email spurred a conversation later that same day between two Aviva officers in Kansas. Canfield concluded that Aviva should terminate Vazirani's contract to sell any of its products "by no later than very early November 2008."

B. Allegedly Defamatory Statements Made by Excel

¶18 In May 2008, an insurance conference was organized in Topeka, Kansas. At that meeting, Excel employees allegedly made verbal statements to unidentified persons that Vazirani and SFS were being investigated by government regulators for illegal activities and would soon be shut down. That same month, in response to an accusation by an executive at Excel that insurance carrier Allianz was considering

terminating Vazirani, an internal Aviva email stated, "We will cancel [Vazirani] as soon as Allianz does." In July 2008, Excel sent an email to Canfield at Aviva stating, "Are 50/50 partners now I guess. See if you can't get him [Vazirani] out of the Aviva family." This email was in response to an alleged prohibited commission split between Vazirani and Matthew Rettich, an agent terminated by Aviva.

C.     Allegedly Defamatory Statements Made by Creative

**¶19**     In July 2008, Michael Tripses, the Chief Executive Officer of Creative, sent an email to Michael Dickerson ("Dickerson"), Aviva's Vice President of Sales and Recruiting in Topeka, Kansas, with the subject heading: "RE: Can you help me get Anil Vazirani's AVIVA contract terminated?"

**¶20**     In August 2008, Tripses sent another business email to Dickerson in which he complained about Vazirani, advising his agents to report violations of the Investment Advisers Act of 1940 by his former agents.

**¶21**     In that same month, Tripses stated in an email to Dickerson: "This guy is bad for the industry." Through this email, Tripses also republished to Dickerson a previous email of the same date sent by Michael Cajthaml, the Senior Vice President of Creative, in which Cajthaml explained how Vazirani threatened to report non-compliant agents if they did not join his company.

## II.    The Defamation Per Se Claims

**¶22**     The first dispute between the parties on the defamation per se claims is whether Arizona law should apply. Vazirani argues that Arizona law applies to all the communications and that Arizona recognizes defamation per se claims. Vazirani also seems to argue that some of the statements could be deemed defamatory in nature, so the court erred in holding the statements were not actionable as defamation or trade libel. Appellees argue that Kansas law applies to all the statements and they were properly dismissed because Kansas does not recognize defamation per se and Vazirani failed to show any damages from the alleged statements. They also argue that none of the statements were defamatory and they were entitled to a qualified privilege.

**¶23**     We conclude that Kansas law applies to all statements except the Annexus Defendants' statements to FIG in North Carolina. Kansas law does not recognize defamation per se claims, *see Polson v. Davis*, 895 F.2d

705, 708 (10th Cir. 1990), and Appellants conceded during oral argument that they never sought to allege any defamation claims except for defamation per se. Accordingly, the trial court properly dismissed all of the defamation per se claims except as to the latter statements to FIG in North Carolina, to which Arizona law applies.

**¶24** In Arizona, defamation per se presumes pecuniary damages for statements which "tend to injure a person in his or her profession, trade or business." *Boswell v. Phx. Newspapers, Inc.*, 152 Ariz. 1, 6 n.4 (App. 1985), *approved as supplemented*, 152 Ariz. 9 (1986).[5] As previously noted, Kansas does not recognize defamation per se. *Polson*, 895 F.2d at 708. Instead, Kansas requires that damages be proven as an element of a defamation claim. *Wright v. Bachmurski*, 29 Kan. App. 2d 595, 600 (2001); *see also Zoeller v. Am. Family Mut. Ins. Co.,* 17 Kan. App. 2d 223, 229 (1992) ("[A]ny plaintiff in a defamation action must allege and prove actual damages and may no longer rely on the theory of presumed damages."). The choice of law is thus outcome-determinative. Because Arizona is the forum state, Arizona choice of law rules will determine whether Kansas' or Arizona's substantive law of defamation applies. *See Pounders v. Enserch E & C, Inc.*, 232 Ariz. 352, 354, ¶ 8 (2013). "We review choice-of-law questions de novo." *Id.* at ¶ 6.

**¶25** In Arizona, the local law of the state with the most significant relationship to the occurrence and the parties determines the rights and liabilities for torts. *Garcia v. Gen. Motors Corp.*, 195 Ariz. 510, 516-17, ¶ 20 (App. 1999); *see also* Restatement (Second) of Conflict of Laws ("Restatement") §§ 6 & 145 (1971). According to section 149 of the Restatement, in a defamation action the state "where the publication occurs determines the rights and liabilities of the parties . . . unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 [of the Restatement] to the occurrence and the parties, in which event the local law of the other state will be applied."[6]

---

[5]     Libel per se covers a written "publication which impeaches the honesty, integrity or reputation of a person . . . and [is] actionable without proof of special damages because damages are presumed." *Peagler v. Phx. Newspapers, Inc.*, 114 Ariz. 309, 316 (1977) (citations omitted).

[6]     "The likelihood that some state other than that where the publication occurred is the state of most significant relationship is greater in those relatively rare situations where the state of publication bears little relation to the occurrence and the parties." Restatement § 149 cmt. b. However, that is not the case here as all of the parties conduct business in Kansas.

Restatement § 149. "[E]ach communication to a person . . . is considered a separate publication for choice-of-law purposes." *Id*. at cmt. a.; *Jaurequi v. John Deere Co.*, 986 F.2d 170, 173 (7th Cir. 1993) (analyzing choice of law provisions for each substantive issue separately). However, we conduct a qualitative analysis of choice-of-law issues and "we [assess] the weight to be accorded each contact in light of the circumstances of th[e] case." *Garcia*, 195 Ariz. at 518, ¶ 23. Accordingly, we must view the presumptive choice of law for defamation as the state in which the publication occurred in light of the factors stated in Restatement § 6 which include: (1) the needs of the interstate and international systems; (2) the relevant policies and interest of the competing forums; (3) the promotion of justified expectations; (4) the basic policies underlying the field of law; (5) the certainty, predictability, and uniformity of result; and (6) the ease of determining and applying the law of the particular forum. Restatement § 6; *Garcia*, 195 Ariz. at 518, ¶ 23.

¶26 As the Restatement explains, in most cases when the person making the allegedly defamatory communication and the person (other than the person defamed) receiving the communication are in the same state, the law of that state will control. Restatement § 149 cmt. c. That state's law also controls the need to show special damages because the conduct and publication occurred in the same state, and that state will have the dominant interest in regulating the defendant's conduct and in determining whether the plaintiff should receive compensation. *Id*. at cmt. b.

¶27 The trial court properly concluded that Kansas law applied to the claims against Excel and Creative. All of the allegedly defamatory communications between representatives of Excel, Creative, and Aviva were originated and published in Kansas. Excel, Creative, and Aviva were incorporated in Kansas, where they also have their places of business. The officers involved were Kansas residents and created or received the communications in their Kansas offices.

¶28 Nor can we say that Arizona has a more significant relationship under Restatement § 6. The needs of the international or interstate systems will not be hindered or advanced by which state's law applies. *Garcia*, 195 Ariz. at 519, ¶ 27. The basic policies of Kansas and Arizona are relatively in equipoise. Arizona may have a basic interest in protecting its citizens from damage to their reputation, but Kansas has a basic policy in limiting liability of its citizens if the plaintiff cannot show any damages from the alleged defamation. The third factor, justified expectations, has little bearing in tort law. *Id*. at 518, ¶ 24. We may give greater weight in this context to the next factor, basic policies underlying the field of law. *Id*. at 519, ¶¶ 28-29. While Arizona may have a basic policy

10

in ensuring that its citizens receive compensation when their reputations are damaged, Kansas has a significant policy in limiting such claims when no damages can be proven. To the extent we would apply this factor when all of the actors are in Kansas, the communication and publication occurred in Kansas, and the business relationship of the parties is in Kansas, this factor favors applying Kansas law consistent with the presumption of Restatement § 149. The next factor, uniformity of result, has little bearing in negligence actions. *Id.* at 518, ¶ 26. The final factor, ease of determining and applying the law of the particular forum, has no bearing because Arizona can easily determine and apply the Kansas law barring defamation per se actions. *Id.*

¶29 Since Kansas does not recognize defamation per se claims, the superior court properly dismissed the defamation per se claims against those two defendants.

¶30 Turning to the Annexus Defendants, the allegedly libelous per se email to Kansas resident Canfield originated in Arizona. However, the email was ultimately published in Kansas, causing the alleged injury to Vazirani's reputation in Kansas, and not in Arizona. As the Restatement explains, when an alleged defamatory statement is communicated from one state to a recipient other than the defamed person in another state so that it is published in the other state, the local law of the state where publication occurs will usually be applied to determine issues relating to the tort. Restatement § 149 cmt. d. Rationales for that rule are to ensure that the person who causes injury in a state cannot escape liability imposed by the local law of that state and because the place of publication is usually readily ascertainable. *Id.* However, if the plaintiff does not have a settled relationship to the state of publication or the "publication of the defamatory matter was done in the course of a relationship between plaintiff and defamer which is centered in the state where the defamer's act of communication was done," then the state in which the defendant acted might be the state of most significant relationship. *Id.* Kansas has the more significant relationship to the occurrence and the parties relative to Arizona. First, Vazirani had a settled relationship with Aviva in Kansas where his reputation was arguably injured. Second, Vazirani and the Annexus Defendants do not have a direct business relationship in Arizona and any possible relationship between them is centered in Kansas through Aviva (or in North Carolina through FIG). Consequently, Kansas' interest in enforcing its laws against foreign residents causing injury within its

borders is more significant then Arizona's interest in deterring its residents from causing injury outside of its borders.[7]

**¶31**      Thus, the trial court properly dismissed the defamation per se claim against the Annexus Defendants as it applied to the email from Arizona to Kansas.[8]

**¶32**      This leaves the allegedly slanderous per se telephone conversation between Shurts, an Arizona resident, and Graham, a North Carolina resident. Because Graham is not a party to this litigation, North Carolina has less significant interest to enforce its laws than Arizona, where the act of communication occurred and where the Annexus Defendants were incorporated, have a residence, and conduct business. Thus, based on the Restatement factors discussed above, Arizona would have the most significant relationship to those communications and the defamation per se claim can survive under Arizona law if the communication was defamatory per se and not privileged.

---

[7]      For the reasons stated *supra*, ¶ 28, the qualitative factors of Restatement § 6 do not change the conclusion that Kansas law should apply to these communications.

[8]      Although the parties also dispute whether any of the above statements could be deemed defamatory, we need not reach that issue because Vazirani never asserted a claim for defamation, but only defamation per se, and Kansas does not recognize defamation per se. Even if Appellants had asserted a defamation claim, they failed to show any damages that resulted from these statements. In his Expert Report on Damages, Vazirani's expert witness John J. Gorman calculated only damages for lost net-profit caused by the termination of contract with Aviva. Gorman specifically stated that he did not calculate, and Vazirani did not otherwise specify, "damages for lost goodwill in Mr. Vazirani's business, statutory interest, punitive damages, legal fees, or other such damages that may be appropriate." We will not consider as purported damages Aviva's cancellation of Vazirani's and his or SFS' downline agents' contracts with Aviva. As we note below in the discussion of the tortious interference claims, Vazirani's claims that the defendants' allegedly defamatory statements resulted in the loss of the Aviva contracts are barred both under the doctrine of issue preclusion because it has already been determined that Aviva had independent business reasons to terminate those at-will contracts and because Vazirani could not show any reasonable possibility those contracts would have continued.

III.     **Whether the Annexus Defendants' Statements to FIG Are Actionable**

¶33          Vazirani argues the trial court erred in finding that the Annexus Defendants' statements made to Graham "do not constitute actionable defamation or libel," and in granting summary judgment. We agree in part, but we limit our review only to slander per se pursuant to our analysis *supra* and pursuant to Vazirani's Second Amended Complaint.

¶34          To fit within the business category of statements slanderous per se in Arizona, "the slanderous utterance must prejudice the person in the profession, trade or business in which he is actually engaged. This means that the statement must be of or concerning one in his business capacity." *Modla v. Parker,* 17 Ariz. App. 54, 56 (1972).

¶35          In *Yetman v. English,* 168 Ariz. 71, 79 (1991), our supreme court established a two-step analysis of when statements are actionable as defamation. First, the trial court decides whether "a statement is even capable of [bearing] a defamatory meaning" under all of the circumstances, and considering the meaning of the words in broad and specific contexts, the impression created by the words, and the expression's general tenor. *Burns v. Davis,* 196 Ariz. 155, 165, ¶ 39 (App. 1999) (citing *Yetman*, 168 Ariz. at 76-79). If a statement is so capable, "the jury then determines whether the defamatory meaning was actually conveyed." *Id*.

¶36          Under Arizona law, "[s]tatements that can be interpreted as nothing more than rhetorical political invective, opinion, or hyperbole are protected speech, but false assertions that state or imply a factual accusation may be actionable." *Id.; see also Rodriguez v. Panayiotou,* 314 F.3d 979, 985 (9th Cir. 2002) ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact.") (citation omitted). When an "allegedly defamatory statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury."[9]  *Breeser v. Menta Grp., Inc.*, 934 F. Supp. 2d 1150, 1162

---

[9]      "If the jury finds that a defamatory statement of objective fact (beyond mere hyperbole) exists, it should then consider actual damage to [the plaintiff's] reputation in the real world by measuring the defamatory aspect of [the statement] by its natural and probable effect on the mind of the average recipient." *Desert Palm Surgical Grp., PLC v. Petta*, 236 Ariz. 568, 579, ¶ 28 (App. 2015) (citations omitted).

(D. Ariz. 2013), *aff'd sub nom. Breeser v. Menta Grp., Inc.*, 622 Fed. Appx. 649 (9th Cir. 2015) (quoting *Rodriguez*, 314 F.3d at 985).

¶37        Vazirani argues that Shurts' statements to Graham were false factual assertions implying that Vazirani conducted his business in an unprofessional and unethical manner and was an undesirable business partner. Annexus Defendants argue Shurts' statements were vague, mere opinions, and did not concern characteristics valuable to Vazirani as a salesman of annuity products.

¶38        Several of Shurts' statements to Graham, taken in their totality and in the context that Shurts was allegedly attempting to persuade Graham to terminate Vazirani's contract, are sufficiently factual in nature and relate to his reputation in the insurance business so as to be reasonably construed as being "capable of [bearing] a defamatory meaning." *Burns*, 196 Ariz. at 165, ¶ 39. Specifically, Shurts' stated: "Nobody wants to do business with him . . . And he's toast after today. I mean, . . . His Aviva's just getting terminated, too" and "He is just done across the board . . . nobody wants to do business with the guy." These statements could be understood as describing Vazirani as an undesirable business partner, and were thus capable of bearing a defamatory meaning.[10] *See Reynolds v. Reynolds*, 231 Ariz. 313, 317, ¶ 10 (App. 2013) (holding that in determining whether a statement could be understood as defamatory, a court should consider the surrounding circumstances "including the impression created by the words used and the expression's general tenor"); *compare Ultimate Creations, Inc. v. McMahon*, 515 F. Supp. 2d 1060, 1065-67 (D. Ariz. 2007) (holding statements concerning former employee of defendant that he was fired because he was unprofessional in not honoring his contracts were sufficiently factual and damaging to his reputation in his profession and his honesty so as to be capable of bearing a defamatory per se meaning), *with Baker v. Tremco, Inc.*, 917 N.E.2d 650, 658 (Ind. 2009) (statement that former salesman had "inappropriate sales practices" was too vague to be construable as defamatory per se). A jury will have to decide whether

---

[10]        In contrast, the statements that Vazirani was a greaseball and a scumbag, *supra*, ¶ 16, are mere opinion and not capable of being defamatory. *See Breeser*, 834 F. Supp. 2d at 1162-63 (holding that the defendant former employer referring to the plaintiff as a "b--ch," even if made in a context in which the recipient might have considered the victim an incompetent in her job, was insufficient to be more than an opinion under Arizona law and thus not actionable as defamation).

Vazirani was actually defamed by these statements and, if so, any damages.[11]

**¶39** The Annexus Defendants argue that Shurts' telephone conversation with Graham was protected by a qualified privilege. Vazirani argues that if such privilege existed, it was abused because Shurts uttered the allegedly defamatory statements with reckless disregard for their truth. We agree with the Annexus Defendants that a qualified privilege applies, but remand to allow a jury to determine whether the privilege was abused.

**¶40** The qualified privilege "is based on the social utility of protecting statements required to be made in response to a legal, moral or social duty." *Green Acres Tr. v. London*, 141 Ariz. 609, 616 (1984). In analyzing whether a qualified privilege exists, "[t]he court must first determine whether a privileged occasion arose," which is a question of law for the court. *Id.* The jury will then determine "whether the occasion for the privilege was abused," *id.*, "unless only one conclusion can be drawn from the evidence," *Melton v. Slonsky*, 19 Ariz. App. 65, 68 (1973) (citation omitted). The privilege can be abused "by excessive publication, by use of the occasion for an improper purpose, or by lack of belief or grounds for belief in the truth of what is said." *Id.*

**¶41** An abuse through excessive publication results from "publication to an unprivileged recipient not reasonably necessary to protect the interest upon which the privilege is grounded." *Lewis v. Oliver*, 178 Ariz. 330, 335 (App. 1993). Abuse through "actual malice" occurs when the defendant makes a statement with knowledge of its falseness or with reckless disregard of whether it was true or not. *Id.*

**¶42** Shurts of Annexus and Graham of FIG shared a duty to enforce the Annexus group's rules governing the sale of Annexus annuities and who would have the right to market those annuities. Shurts' communications to Graham related to whether Vazirani should be allowed to continue marketing those annuities and thus was protected by the qualified privilege. *See Aspell v. American Contract Bridge League,* 122 Ariz. 399, 400 (App. 1979) (holding that a qualified privilege applied to statements published by bridge club members about disciplining one of the

---

[11] However, we cannot say that Shurts' statements were reasonably related to SFS to be "of and concerning" SFS. *See Ultimate Creations,* 515 F. Supp. 2d at 1064 (citation omitted). Accordingly, only Shurts' statements quoted in ¶ 38 of this decision concerning Vazirani may be presented to a jury as possibly defamatory per se.

club's members); Restatement (Second) of Torts, §§ 594-96. Indeed, comment c of section 596 of the Restatement (Second) of Torts notes that a partner is entitled to be told about the discharge of an employee by his fellow partner and the reasons for his discharge even if it reflects on the character of the employee in question. However, the privilege may have been abused when Shurts discussed Vazirani's ability to sell other insurance products, including under Aviva's other distribution channels or for other companies. Moreover, Shurts may have knowingly made a false statement when he claimed that Vazirani's contract with Aviva was terminated, while Canfield did not decide to terminate the Vazirani contract until early November, days after this telephone conversation took place. Whether Shurts abused his qualified privilege by excessive publication, through actual malice, or not at all, is an issue reserved for the jury. *See Green*, 141 Ariz. at 616.

¶43            Accordingly, we reverse the trial court's ruling on Vazirani's only remaining claim of slander per se based on the telephone conversation between the Annexus Defendants and Graham and the statements quoted in ¶ 38, supra. We remand for further proceedings consistent with this decision.

## IV.    Trade Libel Claim against the Annexus Defendants

¶44            For his trade libel claim, Vazirani relied on the same facts as alleged for his defamation per se claims and argued that Arizona trade libel laws apply to the Annexus Defendants' statements. In contrast, the Annexus Defendants argued that Kansas law applies.

¶45            In Arizona, trade libel involves "the intentional publication of an injurious falsehood disparaging the quality of another's property with resulting pecuniary loss." *Gee v. Pima Cty.*, 126 Ariz. 116, 116 (App. 1980) (citation omitted). Special damages are a required element of a trade libel claim. *Id.* (holding that summary judgment was proper because

"appellants failed to allege special damages"). Kansas on the other hand, does not recognize a trade libel action at all.[12]

¶46        However, we do not need to decide which law applies. In either case, Vazirani failed to provide evidence of special damages supporting his claim for trade libel sufficient to avoid summary judgment. As noted *supra*, n.8, Vazirani provided evidence as to damages limited to the loss of the Aviva contract. As we conclude below that Appellants do not have a colorable tortious interference claim, Vazirani cannot show damages from the loss of the Aviva contract. Therefore, his trade libel claim fails.

¶47        Accordingly, we affirm the trial court's decision dismissing Vazirani's trade libel claim against the Annexus Defendants.

## V.    The Tortious Interference with Contract and Business Expectancy Claims

¶48        Appellants' tortious interference with contract and business expectancy claims stem from Aviva's termination of Vazirani's contracts. Appellants alleged that Aviva cancelled Vazirani's contracts as a result of Appellees' tortious interference. Appellants argue that the superior court erred in granting the Appellees summary judgment on these claims based on issue preclusion (formerly known as collateral estoppel) after the Tenth Circuit's decision in *Heitz*.

---

[12]     The most analogous claim is for slander of title, which Kansas courts define as "a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, causing him injury." *LaBarge v. City of Concordia*, 23 Kan. App. 2d 8, 16 (1996) (citations omitted). Slander of title is similar to trade libel, "except that the disparagement in the trade libel goes to the quality of property, rather than title." *Gee*, 126 Ariz. at 116 (citation omitted).

**¶49**     The superior court did not err in granting summary judgment to the Appellees on the interference claims because of issue preclusion and based on the record in this matter.[13]

**¶50**     To establish a prima facie claim for tortious interference with contract, "a plaintiff must show 'the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted.'" *Miller v. Hehlen*, 209 Ariz. 462, 471, ¶ 32 (App. 2005) (quoting *Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427 (App. 1995)).

**¶51**     In *Marmis v. Solot Company*, 117 Ariz. 499, 502 (App. 1977), the court concluded that:

---

[13]     To the extent that Appellants contend the trial court erred in applying Kansas law on these claims, we conclude that such argument is misplaced.  The court only granted the motions for summary judgment on the tortious interference claims after considering the Appellees' argument based on *Heitz* in the motion for reconsideration and reviewing the previously filed motions for summary judgment.  The elements for tortious interference claims in Kansas and Arizona are essentially the same. *Compare Miller v. Hehlen*, 209 Ariz. 462, 471, ¶ 32 (App. 2005) (establishing prima facie claim for tortious interference with contract requires showing of "the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted"), *with Rodriguez v. ECRI Shared Servs.*, 984 F. Supp. 1363, 1366-67 (D. Kan. 1997) (stating the elements essential to recovery for tortious interference with contract as: "(1) the existence of a contract between the plaintiff and a third party; (2) the wrongdoer's knowledge thereof; (3) his or her intentional procurement of its breach; (4) the absence of justification; and (5) resulting damage to the plaintiff"). Accordingly, we will not separately address the issue, as posed by Appellants, of whether the trial court erred in allegedly applying Kansas law to the interference claims.

> Before recovery can be had for interference with [business expectancy] or for preventing a contract, it must appear that a relationship or contract would otherwise have been entered into. It is not necessary that it be absolutely certain that contracts would have been made were it not for the interference. [But there must be] [*r*]*easonable assurance* thereof in view of all the circumstances . . . .

*Id.* (citation and internal quotation marks omitted) (emphasis added). Similarly, "an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which *in all probability* would have been completed if the defendant had not interfered."[14] *Dube v. Likins*, 216 Ariz. 406, 414, ¶ 19 (App. 2007) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994)) (emphasis added). Thus, for Appellants to prevail on either tortious interference claim, they have to be able to show that Appellees' conduct caused Aviva to breach the existing contract with Vazirani. In addition, since the Vazirani contracts were cancellable by Aviva without cause,[15] such contracts were at will, and thus analogous to prospective contracts. *See* Restatement (Second) of Torts § 766 cmt. g. Based upon Appellants' statements at oral argument, we understand Vazirani's prospective business advantage that was allegedly interfered with were future contracts with potential downline agents to market Aviva annuities. Therefore, the interference with prospective business advantage claim rises or falls on whether there was an actionable interference with Vazirani's contracts; if Vazirani could not market Aviva annuities, there was no possibility that any contracts with downline agents to market such annuities could continue.

---

[14] On appeal, Appellants contend the trial court erred in requiring Vazirani to affirmatively prove that his contract with Aviva would have otherwise continued for any specified time to withstand summary judgment on his tortious interference claims. The court did not err on that issue. *See Marmis*, 117 Ariz. at 502 (stating that plaintiff must show reasonable assurance of the business expectancy); *Dube v. Likins*, 216 Ariz. 406, 414, ¶ 19 (App. 2007) (holding that plaintiff must show the business relationship would have continued "in all probability").

[15] Vazirani's contracts provided that they could be terminated with or without cause by either party immediately upon written notice to the last known address of the other party.

¶52            Appellees were entitled to summary judgment on the tortious interference claims for two reasons. First, based on *Heitz*, Appellants were precluded from proving that any improper conduct caused Aviva to cancel its contracts with Vazirani and Appellants could thus not prove there was any reasonable probability that the contract would have continued except for the Appellees' conduct. *See Heitz*, 741 F.3d at 1110-11. Second, the record in this case independently shows that the Appellees were entitled to summary judgment on those claims.

¶53            "[I]ssue preclusion[] *applies when an issue was actually litigated* in a previous proceeding, there was a full and fair opportunity to litigate the issue, resolution of the issue was essential to the decision, a valid and final decision on the merits was entered, and there is common identity of the parties." *Hullet v. Cousin*, 204 Ariz. 292, 297-98, ¶ 27 (2003) (emphasis added). It is the Appellees' burden to show that the elements of issue preclusion have been met. *Bayless v. Indus. Comm'n*, 179 Ariz. 434, 439 (App. 1993); *see also* Restatement (Second) of Judgments § 27 cmt. f (1982) ("The party contending that an issue has been conclusively litigated and determined in a prior action has the burden of proving that contention.").

¶54            It is undisputed that the issue of causation was actually litigated and that Appellants had a full opportunity to litigate that issue in *Heitz*. Indeed, one of their claims was that Aviva's two executives interfered with Appellants' contracts with Aviva[16] as a result of the same conduct of Appellees, which they claim here interfered with the Aviva contracts and caused their termination. *Heitz*, 741 F.3d at 1105, 1107-08.

¶55            In *Heitz*, the issue of whether Aviva had business reasons for terminating Vazirani's contract and those of his downline agents, regardless of any conduct by the Appellees, was essential to the Tenth Circuit's judgment that Aviva executives did not terminate Vazirani's contract for its officers' purely personal reasons. As the Tenth Circuit explained in *Heitz,* regardless of whether the Aviva executives might have had personal reasons to have Aviva cancel Appellants' contract based on Excel's, Annexus Defendants', and Creative's alleged misconduct, Aviva would have and did cancel that contract for two business reasons. First, Aviva wanted to focus on core marketing groups so that Aviva could limit annuity sales and Appellants' contract with Aviva was to sell annuities. *Id.*

---

[16]       The main issue in *Heitz* was whether former Aviva executives were motivated solely by personal reasons when they terminated Appellants' contract with Aviva. *Heitz*, 741 F.3d at 1105.

at 1110. Second, the circuit court explained that Vazirani's "improper business practices" "caused problems between Aviva and [its business partner,] Annexus." *Id.* at 1106, 1110-11. Appellants contend these are the same reasons Aviva cancelled Vazirani's contracts here.

¶56 As the Appellees explained at oral argument, given the independent business reasons for Aviva's decision to terminate Vazirani's contracts with Aviva, Appellants are now precluded from showing any reasonable assurance that the at-will contract with Aviva would have continued absent the Appellees' conduct. We agree. Given the Tenth Circuit's decision that no triable issue of fact existed on Aviva's independent business reason to terminate contracts to focus on annuity sales, Appellants are precluded from showing that the contract would have reasonably continued but for the Appellees' conduct.

¶57 Appellees also met their burden of showing the final two elements of issue preclusion. *Heitz* was a valid and final judgment on the merits of Vazirani and SFS' claims for tortious interference with contract. *See generally id*. at 1104-11. Finally, although Excel, the Annexus Defendants, and Creative were not parties to *Heitz*, party commonality is not required where, as here, the doctrine of issue preclusion is used defensively. *See Campbell*, 204 Ariz. at 223, ¶ 10 ("If the first four elements of [issue preclusion] are present, Arizona permits defensive, but not offensive use of the doctrine.").

¶58 To avoid issue preclusion, Vazirani argues this Court is not bound by the factual findings in *Heitz* as the real issue in *Heitz* was whether the Aviva officers had purely personal motives to have their employer terminate Vazirani's contracts. It is not the factual findings from *Heitz* that trigger issue preclusion; it is the decision in *Heitz* that no triable issue as to the tortious interference claims existed because Aviva had independent business reasons to terminate Vazirani's contracts, including Aviva's decision to focus on selling non-annuity products through its core groups. *See Heitz*, 741 F.3d at 1110-11. Thus, we find inapplicable Appellants' argument that *Heitz* is irrelevant because its factual findings do not bind this Court and because the findings concern a different legal standard.

¶59 Even if we were to conclude that *Heitz* is not issue preclusive, Appellants could not prove actionable interference. As previously noted, Vazirani's contracts were terminable at will. Given the nature of those contracts, Appellants had to show a "reasonable assurance" of the business

expectancy[17] and/or that the contractual relationship would have continued "in all probability,"[18] but for Appellees' alleged tortious interference.

¶60     In their briefs and at oral argument, all parties agreed that Aviva had business reasons to terminate Vazirani's contracts independent of the alleged tortious interference. While Appellants argue that one of the independent reasons may have been pre-textual[19] and a jury is entitled to decide whether it was pre-textual, Appellants do not provide sufficient evidence from which a reasonable jury could conclude they had either a "reasonable assurance" in their business expectancy with Aviva or that there was a "probability" the contract would have continued if not for Appellees' alleged interference and in spite of Aviva's stated business reasons.

¶61     At oral argument, Appellants' counsel pointed to one statement in the record he argued created a genuine dispute whether such a "reasonable assurance" existed to be resolved by the jury; an email exchange between two Aviva representatives. However, that exchange did not mention the status of Appellants' contract otherwise continuing, but only that one of the Aviva representatives did not "mind cancelling [Vazirani's contract] for Ron," presumably meaning Ron Shurts. The fact that Aviva terminated thousands of other agents, some of whom were top earners like Appellants, further supports Aviva's uncontroverted reasoning that it terminated Appellants' contracts as part of its overall effort to focus on its core groups. Given the standard for surviving summary judgment, we cannot say that this email exchange created a genuine issue of material fact. *See Airfreight*, 215 Ariz. at 110, ¶ 19 ("A trial court should only grant a motion for summary judgment 'if the facts produced in support of the claim . . . have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the

---

[17]     *See Marmis*, 117 Ariz. at 502.

[18]     *See Dube*, 216 Ariz. at 414, ¶ 19.

[19]     Appellants argue that Aviva's reason that it terminated their contract in an overall effort to focus on its core groups to limit annuity sales was pre-textual because FIG, of which Vazirani was a part, was not also terminated with Vazirani. However, FIG, unlike Appellants, is a core group of Aviva; thus, the fact that FIG remains a core group of Aviva is consistent with Aviva's reasoning that it wanted to focus on its core groups.

proponent of the claim . . . .'") (citation omitted); *see also Nat. Bank of Ariz. v. Thruston*, 218 Ariz. 112, 116, ¶ 20 (App. 2008) (party is entitled to summary judgment if "no reasonable juror could conclude from the evidence" that the claim could be established) (citation and internal quotation marks omitted). In meeting that standard, Appellees did not need to affirmatively establish the negative of the element of the claim. *Id*. at 117, ¶ 21.

**¶62**         Without Appellants providing sufficient evidence to support either of the respective showings, we decline to overlook Aviva's stated business reasons.

**¶63**         It is undisputed that Aviva had the right to terminate Appellants' contracts without cause and we will not disregard its reasons for concluding it was no longer practical to maintain its contract with Appellants. *See Marmis*, 117 Ariz. at 503 (stating that an agreement can be terminated where its purposes have become "impracticable"). Summary judgment is appropriate where, as here, Appellants have not demonstrated any genuine dispute of material fact for a jury to resolve. *Kadlec v. Dorsey*, 224 Ariz. 551, 553, ¶ 12 (2010); *Orme Sch.*, 166 Ariz. at 305-06, 309-10. Accordingly, we affirm the trial court's grant of summary judgment in favor of Appellees on Appellants' claims of tortious interference with contract and business expectancy.

## VI.    Appellees' Taxable Costs Claims

**¶64**         On the cross-appeal, Appellees argue the superior court erred in not awarding them all of their requested costs. They claim that because the court, without explanation, failed to award costs objected to by Vazirani, the court must have denied the requests based on Vazirani's objections. The excluded costs are for video-recordings of certain depositions ($7,453), travel expenses (including non-airfare travel expenditures) associated with certain depositions ($6,425.57), and the costs for a private mediator ($500). Although the court never explained which costs it was denying, we infer findings to sustain its judgment. *See Elliott v. Elliott*, 165 Ariz. 128, 135 (App. 1990) (stating that except in cases where a party requests findings of facts, when the basis on which a court reached a certain conclusion is not clear, the "appellate court may infer that the trial court has made the additional findings necessary to sustain its judgment," and that this "principle applies as long as the additional findings are reasonably supported by the evidence and are not in conflict with any of

the trial court's express findings") (internal citation omitted).[20]  Since the court signed the proposed judgment lodged by Vazirani without explanation and that judgment essentially deleted the costs to which Vazirani objected, we will infer the court agreed with Vazirani on which costs to deny.

¶65        For the following reasons, we affirm the costs awarded by the superior court except for its denial of mediation fees.  We also vacate the costs awarded to the Annexus Defendants as premature.

¶66        Taxable costs are identified in A.R.S. § 12-332(A) (2016).  Unless authorized by statute, litigation expenses cannot be recovered as costs.  *Reyes v. Frank's Serv. and Trucking, LLC*, 235 Ariz. 605, 608, ¶ 6 (2014) (quoting *Schritter v. State Farm Mut. Auto. Ins. Co.*, 201 Ariz. 391, 392, ¶ 6 (2001)).  On appeal, we review the trial court's award of costs for an abuse of discretion, and we will affirm the award if it has any reasonable basis.  *Maleki v. Desert Palms Prof'l Props., LLC*, 222 Ariz. 327, 333-34, ¶ 32 (App. 2009).  However, we review issues of statutory interpretation *de novo*.  *Schwab Sales, Inc. v. GN Constr. Co.*, 196 Ariz. 33, 36, ¶ 9 (App. 1998); *see Foster v. Weir*, 212 Ariz. 193, 195, ¶ 5 (App. 2006) (stating that whether a particular expenditure qualifies as a taxable cost is a question of law that we review *de novo*).

¶67        Thus, our process of review of taxable costs awards may be broken into two parts: (1) whether, as a matter of law, the subject expenditures *qualify* as taxable costs pursuant to A.R.S. § 12-332(A); and (2) notwithstanding a finding that the expenditures are deemed taxable costs, whether the trial court abused its discretion in deciding not to *award* taxable costs.  As to the latter, we recognize that the trial court may deny an award of taxable costs where it reasonably makes the discretionary determination that the underlying expenditures were not both necessarily and reasonably incurred.  *See, e.g., Rabe v. Cut and Curl of Plaza 75, Inc.*, 148 Ariz. 552, 555 (App. 1986) (stating taxable costs include expenses necessarily and reasonably incurred to obtain adverse expert's deposition testimony); *Fowler v. Great Am. Ins. Co.*, 124 Ariz. 111, 114 (App. 1979) (taxable costs

---

20        *See also John C. Lincoln Hosp. & Health Corp. v. Maricopa Cty.*, 208 Ariz. 532, 538, ¶ 23 (App. 2004) ("[I]mplied in every judgment, in addition to express findings made by the court, is any additional finding that is necessary to sustain the judgment, if reasonably supported by the evidence, and not in conflict with the express findings.") (citation and internal quotation marks omitted).

include "reasonable and necessary travel expenses incurred for the taking of depositions").

¶68        As relevant here, A.R.S. § 12-332(A) provides:

A. Costs in the superior court include:

. . .

2. Cost of taking depositions.

. . .

6. Other disbursements that are made or incurred pursuant to an order or agreement of the parties.

*Id.*

A.      Video Recording of Depositions in Addition to Obtaining Written Transcripts of the Same Depositions

¶69        Appellees argue the superior court abused its discretion by not awarding them their requested costs for video recording of certain depositions. The relevant video recordings for which the trial court did not award taxable costs totaled $7,453. We do not agree with Appellees.

¶70        Expenditures for video recording a deposition qualify as taxable costs. *See Reyes*, 235 Ariz. at 611, ¶ 20 ("Expenses associated with properly noticed video-recorded depositions are undeniably '[c]ost[s] of taking depositions.' As such, they qualify as taxable costs under the plain language of the statute.") (quoting A.R.S. § 12-332(A)(2)).

¶71        However, notwithstanding their status as taxable costs, we next inquire as to whether the video cost expenditures were *necessarily incurred* and *reasonable in amount*. *See id.* at ¶¶ 21, 22 (stating that when a party has chosen to incur expenses for both written transcripts and video-recordings of depositions, "the trial court must determine the reasonableness and necessity of those expenses on a case-by-case basis. . . . [T]he necessity and reasonableness of *both* modes of preservation is a question for the trial court to resolve.") (emphasis added).

¶72        Appellees argue that the video-recordings were necessary and reasonable expenditures because: (1) presenting depositions to the jury through video is *more effective*; (2) it was necessary to video tape the deposition testimony of key, out-of-state, non-party witnesses *to effectively*

25

*use* excerpts from their depositions at trial; and (3) it was reasonable and necessary to obtain video tapes of Vazirani's deposition, despite the fact that he is an Arizona resident, to permit an examination of his credibility and to demonstrate inconsistences in his testimony.

¶73 The superior court did not abuse its discretion. None of Appellees' arguments permit us to override a conclusion by the trial court that the video recordings were not necessarily incurred and/or not reasonable in amount given the availability of the written transcripts, even if the recordings may have been more efficacious. Accordingly, we affirm the trial court's decision not to award taxable costs for video recordings.

B. Travel Costs

¶74 Appellees argue the superior court erred in not awarding them their travel costs incurred in connection to certain, primarily out-of-state depositions. They seek an award of taxable costs for their attorneys (1) travelling to Kansas to attend Appellants' depositions of three Excel principals; (2) non-airfare travel costs such as food and lodging related to non-party depositions of FIG and Aviva representatives in North Carolina and Kansas, respectively; and (3) Creative's instate travel costs to attend depositions in Kansas.[21] We affirm the court's decision.

¶75 Section 12-332(A)(2) does not distinguish in-state deposition costs from out-of-state deposition costs. *See generally* A.R.S. § 12-332; *Schrittter*, 201 Ariz. at 392, ¶ 9; *Reyes*, 235 Ariz. at 609, ¶ 11. "[B]oth in-state and out-of-state deposition expenses may be recovered as taxable costs under § 12-332(A)(2) if they are reasonably and necessarily incurred." *Reyes*, 235 Ariz. at 609, ¶ 12 (citing *Fowler*, 124 Ariz. at 114) (stating that trial courts have broad discretion in setting the amount of a taxable cost awards and should consider the need for the expenditure and its reasonableness). We have construed the statute as permitting the recovery of reasonable travel expenses for attorneys. *See, e.g., Schrittter*, 201 Ariz. at 392, ¶ 9; *DeMontiney v. Desert Manor Conval. Ctr.*, 144 Ariz. 21, 29 (App. 1984) (upholding the trial court's characterization of travel expenses that Phoenix

---

[21] Although on cross-appeal Creative sought review of the trial judge's denial of costs associated with its counsel's travel to Palm Desert, California, for a non-party deposition, Creative withdrew its request for review as to those costs in its reply brief. We do not review those costs here.

attorneys incurred in attending depositions in Yuma as taxable costs under section 12-332(A)), *vacated in part on other grounds*, 144 Ariz. 6 (1985).[22]

¶76          While these travel costs qualify as taxable costs under section 12-332(A), we cannot find that the superior court abused its discretion. The trial court has great latitude in assessing the amount of recoverable travel costs to award. *Parrish v. Camphuysen*, 107 Ariz. 343, 347 (1971); *see Fowler*, 124 Ariz. at 114. "[O]n appeal we shall not disturb the trial court's exercise of discretion absent a showing of *clear abuse*." *DeMontiney*, 144 Ariz. at 29 (emphasis added). The court could have concluded that having all the attorneys travel to Kansas and North Carolina to take the depositions was simply unreasonable. This would not be an abuse of discretion.

C.     Private Mediator

¶77          Appellees next challenge the superior court's decision not to award them costs associated with their share of private mediation expenses. We reverse the superior court on this cost, except as to the Annexus Defendants for whom such a cost award is premature.

¶78          Section 12-332(A)(6) authorizes as taxable costs a cost award for "[o]ther disbursements that are made or incurred pursuant to an order or agreement of the parties." *Id.* When dealing with the costs related to retaining a private mediator, "the relevant inquiry under the statute is whether the parties agreed to incur the costs, not whether they reached a specific agreement about how the costs would ultimately be classified." *Reyes*, 235 Ariz. at 612, ¶ 29 (finding that taxable costs were properly awarded when the parties agreed to incur costs in retaining a private mediator, but did not address the reasonable and necessary component of the requisite analysis).

¶79          It is undisputed that the court ordered the parties to attempt to mediate the dispute and the parties hired a private mediator. Appellants objected to qualifying the mediator as a referee under § 12-332(A)(3). However, as Excel pointed out in its reply, mediation costs qualify under § 12-332(A)(6) as a disbursement incurred pursuant to an agreement of the parties or ordered by the court. *Reyes*, 235 Ariz. at 612, ¶ 29. On appeal, Appellants conceded that point, but they argued the parties agreed to independently incur their pro rata portions of the mediation fee and that

---

22      *See, e.g., Schrittter*, 201 Ariz. at 392, ¶ 9; *see Young's Mkt. Co. v. Laue*, 60 Ariz. 512, 517 (1943) (finding that meals and taxi fare were legitimate taxable costs in taking depositions).

the fee was not necessary.  They cite no evidence in the record supporting the pro rata division agreement and ignore that the court ordered mediation, requiring the cost to be incurred.  Accordingly, given the limited and unsupported argument against the mediation fees based on a pro rata division, the superior court erred in denying the $500 per party mediation cost incurred by Excel and Creative.

## CONCLUSION

¶80      For the reasons stated above, we affirm the superior court's summary judgments for Appellees except for the summary judgment on Vazirani's defamation per se claim against the Annexus Defendants based on those communications with FIG which we have found to be capable of being construed as defamatory per se.  We remand on that one claim for further proceedings consistent with this decision.  We also affirm the superior court's rulings on costs except that we vacate the award of costs to the Annexus Defendants as premature and reverse the court's denial of Excel and Creative's request for costs for paying the mediator's fee.  We will award Excel and Creative's taxable costs on appeal upon timely compliance with Arizona Rule of Civil Appellate Procedure 21.



Ruth A. Willingham · Clerk of the Court

FILED: AA